[L. A. No. 3663.   In Bank.—September 11, 1916.]

## CITY OF LOS ANGELES, Respondent, v. CENTRAL TRUST COMPANY OF NEW YORK et al., Appellants.

PUBLIC UTILITIES ACT — CROSSING OF STREET AND RAILROAD — RAILROAD COMMISSION—CROSSINGS IN CITY OF LOS ANGELES.—The provision of section 43 of the Public Utilities Act of 1911, (Stats. Spec. Sess. 1911, p. 18), that no grade crossings of any railroad by a street, or of any street by a railroad, shall be made without the permission of the railroad commission first obtained, that the commission shall have power to refuse or grant such permission upon such terms and conditions as it may prescribe, and that it shall have exclusive power to determine and prescribe the manner and place of making such crossings and to abolish the same, at its pleasure, does not apply to street openings and railroad crossings within the city of Los Angeles.   This follows, whether the Public Utilities Act be regarded as a general law on that subject, and considered independently of any special authority to legislate upon that subject under the provisions of section 23 of article XII of the constitution, or be considered as an exercise of the power to legislate over the subject of public utilities specially given by that section of the constitution.

ID.—RESERVED POWER OF MUNICIPALITIES OVER PUBLIC UTILITIES UNDER CONSTITUTION. — The power of the legislature to pass the Public Utilities Act is derived from section 23 of article XII of the constitution, which reserves to every incorporated city all the powers of control over public utilities relating to the making and enforcement of local, police, sanitary, and other regulations, other than the fixing of rates, which are vested in such city, unless the city by popular vote chooses to transfer the same to the railroad commission.   Section 82 of the Public Utilities Act in substantially identical terms makes the same reservation in favor of cities.   The city of Los Angeles has never elected to make such transfer, consequently it still retains unimpaired all its regulatory powers of control over public utilities, except rate making.

ID. — MUNICIPAL AFFAIRS — CITY CHARTERS PARAMOUNT TO GENERAL LAWS.—Under section 6 of article XI of the constitution, as

amended in 1914, and as it existed prior thereto, city charters framed and adopted under the provisions of the constitution are paramount to general laws with respect to municipal affairs.

ID.—OPENING AND CONTROL OF STREETS ARE MUNICIPAL AFFAIRS.—The opening, laying out, and improvement of streets within a city, and the regulation of the manner of their use, are matters of much greater concern to its inhabitants than to the people of the state at large, and are municipal affairs, the control of which has always been deemed within the proper scope of municipal powers.

ID. — CITY OF LOS ANGELES — PARAMOUNT AUTHORITY OVER RAILROAD CROSSINGS — CHARTER SUPERSEDES PUBLIC UTILITIES ACT. — The power to establish, lay out, and open streets and crossings thereof, and to regulate the construction and operation of railroads within the city, conferred on the city of Los Angeles by section 2 of its charter of 1889, and the amendments of 1905, 1909, and 1911, includes the power to open a street across an existing railroad, and to regulate the operations of the railroad at such crossing, as well as elsewhere within the city. The power to acquire land for that purpose applies as well to the land of a railroad company as to that of any other person. Being municipal affairs, the provisions of the charter on the subject are paramount, and supersede general laws, which would otherwise apply thereto, including the Public Utilities Act, so far as operations within the city are concerned.

ID.—CONDEMNATION SUIT—CHARTER SUPERSEDES SECTION 1247 OF CODE OF CIVIL PROCEDURE.—Section 1247 of the Code of Civil Procedure, vesting in the superior court the power to make regulations affecting the crossings of streets and railroads whenever they are involved in a condemnation suit, is a general law, and was superseded as to the city of Los Angeles by such provisions of its charter.

APPEAL from a judgment of the Superior Court of Los Angeles County.   Charles Monroe, Judge.

The facts are stated in the opinion of the court.

J. W. McKinley, Frank Karr, A. W. Ashburn, Jr., Joline, Larkin & Rathbone, and Murray, Prentice & Howland, for Appellants.

Max Thelen, and Douglas Brookman, *Amici Curiae,* for the Railroad Commission of the State of California.

Albert Lee Stephens, City Attorney, and Charles S. Burnell, Assistant City Attorney, for Respondent.

Corbet & Selby, *Amici Curiae,* on Petition for Rehearing.

SHAW, J.—The defendants appeal from the judgment.

By regular proceedings under the Street Opening Act of 1903 (Stats. 1903, p. 376), and subsequent amendments thereto, the city council of Los Angeles ordered the opening of Arlington Street across a strip of land owned in fee by the defendant Southern Pacific Company and used by it as a part of its right of way for its railroad, and directed the city attorney to bring an action in the name of the city for the condemnation of the interest of the defendants in the land necessary to be taken for said crossing. This action was begun in pursuance of said order.

Upon the trial the parties stipulated that the condemnation of the lands by the city for street purposes should not interfere with nor prejudice the defendants in the use of said land for the maintenance and operation of its railroad thereon, and that with that condition appended to the right to open and use the street, the value of the land to be taken was ten dollars. The court below found the necessary facts regarding the proceedings for the opening of the street and the right of the city to condemn the land and, in pursuance of the stipulation, entered judgment of condemnation, fixing the value of the land taken at ten dollars. Proceedings to open the street were begun on December 26, 1911. This action was begun in April, 1912, and judgment was given in May, 1913.

The appellants base their appeal upon section 43 of the Public Utilities Act of 1911, which took effect March 23, 1912 (Special Sess. 1911, p. 18), providing that no grade crossings of any railroad by a street, or of any street by a railroad, shall be made without the permission of the railroad commission first obtained, that the commission shall have power to refuse or grant such permission upon such terms and conditions as it may prescribe, and that it shall have exclusive power to determine and prescribe the manner and place of making such crossings and to abolish such crossings, at its pleasure. Their position is that this provision withholds from the superior court jurisdiction to entertain the condemnation suit for the opening of the street across a railroad in operation until after the permission of the railroad commission shall have been obtained. If section 43 is in force in the city of Los Angeles, and is to be construed as claimed by appellants, the effect would be that the land for the crossing cannot be acquired by condemnation, nor the crossing itself

established, until after the railroad commission has consented thereto, and then only upon compliance with the conditions which it may prescribe.

It is contended by the respondent that, conceding the statute to have this effect, it would not divest the superior court of jurisdiction, but would give the court power to entertain the action and render its judgment of condemnation, leaving the city to make its application to the railroad commission after having acquired title to the land in the condemnation proceeding. To this, objection is made on the ground that it would be futile to subject the property owner to the expense of the litigation necessary to obtain the judgment of condemnation before it could be known whether the crossing could be established at that point or not, and that the damages could not be estimated until the conditions regulating its maintenance were prescribed. We do not think it necessary to determine the question thus presented. We have concluded that the aforesaid section of the Public Utilities Act does not apply to street openings and railroad crossings within the city of Los Angeles.

The power of the legislature to pass the Public Utilities Act is derived from the provisions of section 23, article XII, of the constitution. This constitutional provision reserved to every incorporated city all the powers of control over public utilities relating to the making and enforcement of local, police, sanitary, and other regulations, other than the fixing of rates, which are vested in such city, unless the city by popular vote chooses to transfer the same to the railroad commission. Section 82 of the Public Utilities Act in substantially identical terms makes the same reservation in favor of cities. The city of Los Angeles has never elected to make such transfer. Consequently, it still retains unimpaired all its regulatory powers of control over public utilities, except rate fixing. Section 6, article XI, also provides that city charters framed and adopted under the provisions of that article shall not be subject to or controlled by general laws, so far as municipal affairs are concerned. The amendment of 1914 to section 6 uses different terms but does not change the effect, and it still leaves such city charters paramount to general laws with respect to municipal affairs. The charter of the city of Los Angeles, as amended on March 25, 1911 (Stats. 1911, p. 2061), gave to that city the following powers: "To establish, lay out,

open, . . . or vacate, . . . streets, . . . crossings, . . . and other public places." (Sec. 2, subd. 13.) Also "to acquire by . . . condemnation, . . . real property . . . within or without the city, necessary, . . . for the exercise of the powers of the corporation." (Sec. 2, subd. 16.) Also "to regulate, subject to the provisions of the constitution of the state of California, the construction and operation of railroads," and other public utilities in their operations within the city. (Sec. 2, subd. 30.) The charter of 1889 and the amendments of 1905 and 1909 to section 2 thereof gave to the city similar powers. (Stats. 1889, p. 457; Stats. 1905, p. 994; Stats. 1909, p. 1291.)

The opening, laying out, and improvement of streets within a city, and the regulation of the manner of their use are matters of much greater concern to its inhabitants than to the people of the state at large, and they are clearly municipal affairs, the control of which has always been deemed within the proper scope of municipal powers. (*Sinton* v. *Ashbury*, 41 Cal. 531; *People* v. *Holladay*, 93 Cal. 241, 248, [27 Am. St. Rep. 186, 29 Pac. 54]; *Hellman* v. *Shoulters*, 114 Cal. 136, 149, [44 Pac. 915, 45 Pac. 1057]; *Byrne* v. *Drain*, 127 Cal. 663, 667, [60 Pac. 433].) The power to establish, lay out, and open streets, and crossings thereof, and to regulate the construction and operation of railroads within the city includes the power to open a street across an existing railroad as well as anywhere else within the city, and to regulate the operations of the railroad at such crossing as well as elsewhere. The power to acquire land for that purpose applies as well to the land of a railroad company as to that of any other person. The charter, therefore, vested in the city of Los Angeles the power to open this street across the defendants' railroad, to acquire such interest in the land as was necessary for that purpose, and to regulate the manner in which the crossing should be maintained, guarded, and protected by the railroad company and the municipal authorities, respectively. Being municipal affairs the provisions of the charter on the subject are paramount and supersede general laws which would otherwise apply thereto, so far as operations within the city are concerned. (*Law* v. *San Francisco*, 144 Cal. 384, 391, [77 Pac. 1014]; *Fritz* v. *San Francisco*, 132 Cal. 377, [64 Pac. 566]; *Byrne* v. *Drain*, 127 Cal.

663, [60 Pac. 433]; *Barber etc. Co.* v. *Costa,* 171 Cal. 138, [152 Pac. 298].)

Therefore, if we regard the Public Utilities Act as a general law on the subject and consider it independently of any special authority to legislate upon that subject given to the legislature by the provisions of section 23 of article XII of the constitution, the conclusion is inevitable that the charter provisions override those of the Public Utilities Act on the subject so far as the same would otherwise apply to the city of Los Angeles.

If we consider the Public Utilities Act as an exercise of the power to legislate over public utilities specially given to it by the last-cited section of the constitution, we find that the legislature is restricted in its powers by the aforesaid proviso declaring that all powers theretofore vested in a city respecting the local control of public utilities shall remain unimpaired, until such city has voted to transfer such powers to the railroad commission, that these powers, in cities such as Los Angeles, are reserved to the city, and hence that they are unaffected by any act of the legislature purporting to confer power of that character upon the railroad commission. For these reasons we are of the opinion that the provision of the Public Utilities Act has no application to this case.

It is contended, however, by the appellants and also in a brief, filed *amicus curiae* on behalf of the railroad commission, that the city of Los Angeles never possessed the power to regulate the place and manner of making crossings of streets and railroads within its limits, because, as they say, section 1247 of the Code of Civil Procedure, enacted in 1872, vested in the superior court the power to make such regulations whenever they should be involved in a condemnation suit. The provision of that section is as follows:

"The court shall have power—

"1. To regulate and determine the place and manner of making connections and crossings, or of enjoying the common use mentioned in the fifth subdivision of section twelve hundred and forty."

If section 1247 were construed to give the superior court power to determine the places where public streets should be allowed to cross existing railroads, and to make regulations governing the manner of making such crossings, it would

confer legislative power upon the judicial department of the state. The opening and maintaining of public streets and the regulation of the manner of making crossings of streets and railroads so as to promote the public safety and welfare are legislative functions, and hence it may be doubted if under article III of the constitutions of 1849 and 1879, such functions could be given to the superior court by the legislature. (*Wulzen* v. *Board of Supervisors,* 101 Cal. 15, 21, 25, [40 Am. St. Rep. 17, 35 Pac. 353]; *People* v. *Provines,* 34 Cal. 532; *Smith* v. *Strother,* 68 Cal. 194, 196, [8 Pac. 852].) Perhaps the power so given extends only to the making of such provisions in the judgment of condemnation as may be appropriate to preserve the rights of the respective parties, having reference to the compensation to be made for the taking, and to secure to them the guaranty of the fifth (now the seventh), subdivision of section 1240 and of section 1242, that the property shall be taken in the manner most compatible with the greatest public good and the least private injury. In doing so the court must comply with existing regulations on the subject made by the legislative department. We need not discuss its scope in this direction nor decide the questions which might arise concerning it. Whatever it may mean it cannot prevail over the provisions of the city charter of Los Angeles, above quoted, on the subject, so far as to interfere with the powers of the city to extend and open streets. These provisions relate to municipal affairs, and, as we have said, they are paramount to general laws and supersede such laws where inconsistent therewith. This section of the Code of Civil Procedure is not to be distinguished in this respect from any other general law inconsistent with the charter, and it falls within the rule above applied to the Public Utilities Act considered independently of the special legislative authority given by section 23, article XII, of the constitution. The power to open a street, establish the crossing, and regulate the use thereof and the manner of making it were, therefore, vested in the city of Los Angeles at the time the Public Utilities Act and section 23, aforesaid, became the law, and by virtue of the reservation in said section 23 and of section 82 of the act, if not otherwise, they remain vested in the city and not in the railroad commission, anything in section 1247 of the Code of Civil Procedure to the contrary notwithstanding.

This conclusion disposes of the case and settles all the questions presented by the record.

The judgment is affirmed.

Sloss, J., Lorigan, J., Lawlor, J., and Angellotti, C. J., concurred.

HENSHAW, J., Concurring.—I concur in the foregoing opinion and judgment. I do so because I agree with my associates that the law is so written. One may be permitted, however, to express the regret that the law itself is not otherwise. Touching a public utility operating wholly within the corporate limits of a municipality, no reason can be perceived why its regulation and control might not with propriety be intrusted to the municipal authorities; but the condition is very different where the operations of the utility extend beyond the boundaries of a city, and where its services are rendered to several or to many other communities and cities. In such cases it is manifest that the welfare of all concerned— of the utility, of the public, and of the state—is best conserved by placing the whole control under a single board or commission—in this state, the railroad commission—empowered to adjust all questions which may arise, in the light of all interests entitled to consideration. But, as pointed out, our laws are designedly framed so as not to do this thing, and, as framed, they must be given effect.

Melvin, J., concurred.

Rehearing denied.