[L. A. No. 5028.   In Bank.—June 11, 1917.]

CIVIC CENTER ASSOCIATION OF LOS ANGELES (a Corporation), et al., Petitioners, v. RAILROAD COMMISSION OF THE STATE OF CALIFORNIA, Respondents.

Public Utilities — State Railroad — Street Crossings in Municipality—Jurisdiction of Railroad Commission—Municipal Affair — Charter of Los Angeles.—Under sections 22 and 23 of article XII of the state Constitution, and section 43(b) of the Public Utilities Act of 1915 (Stats. 1915, p. 137), the Railroad Commission has jurisdiction to require state railroads, whose lines of track pass through the city of Los Angeles, to establish viaducts or subways at street crossings in such city, as the regulation of such railroads in that particular is a matter of general state concern, and is not a "municipal affair," within the meaning of sections 6 and 8 of article XI of the state Constitution, as amended in 1914, or of subdivisions 51 and 53 of section 2 of the charter of Los Angeles, which were added thereto by amendments that took effect on January 16, 1917.

APPLICATION for a Writ of Mandate directed to the Railroad Commission of the State of California.

The facts are stated in the opinion of the court.

Marshall Stimson, T. E. Gibbon, and Corbet & Selby, for Petitioners.

Douglas Brookman, and Max Thelen, for Respondent.

Albert Lee Stephens, City Attorney of Los Angeles, and Charles S. Burnell, Assistant City Attorney, *Amici Curiae,* for City of Los Angeles.

SHAW, J.—This is an application for a writ of mandate against the Railroad Commission to compel it to hear and determine the complaints of the plaintiffs, asking that the several railroads entering the city of Los Angeles be required to abolish grade crossings and establish and use a common union depot within said city.

Sections 60, 61, and 62 of the Public Utilities Act of 1915 provide that any corporation or person, municipal corporation, body politic, or any civic, commercial, or mercantile association may complain in writing to the Railroad Commission, "setting forth any act or thing done or omitted to be done by any public utility," that thereupon said commission shall fix the time for the hearing of such complaint and give notice thereof to the public utility complained of, and that upon such hearing the commission shall render its decision and order concerning the matter complained of. (Stats. 1915, p. 157.) Section 67 of said act provides that the writ of *mandamus* shall lie from the supreme court to the commission in all proper cases.

In July, 1916, the three plaintiffs herein, in pursuance of these provisions, each filed a complaint with the Railroad Commission against the Southern Pacific Company, the Atchison, Topeka and Santa Fe Railway and San Pedro, Los Angeles, and Salt Lake Railroad Company. Each of these companies owns and operates an extensive system of railways, embracing several hundred miles of track in the state of California, each line running from other states into California and passing through the city of Los Angeles. Each company maintains in said city, on its own track, passenger and freight depots for its own use. The tracks running to each of these depots from outside the city cross numerous streets of the city of Los Angeles on the same level as the streets. These are the grade crossings referred to in the respective complaints made to the commission. The commission fixed the hearing for September 15, 1916, and gave due notice to the three railroad companies complained of. On October 21, 1916, the commission decided that it had no jurisdiction over the streets of the city of Los Angeles, or over

said railroads to direct them to cross the same by subways or viaducts below or above the street grades, and refused to proceed further in the matter.

It is proper to say that the members of the commission believed that it had such jurisdiction and that they took this course in order to bring about a speedy and authoritative determination of the question, being advised that the complainants would seek a writ of mandate to compel the commission to hear and determine the matters in controversy. Accordingly, this complaint was filed praying this court to issue a writ of mandate commanding said commission to proceed to hear and determine said complaints upon the merits.

The city of Los Angeles was not made a party to this proceeding. The city attorney has been allowed to appear, as *amicus curiae,* on behalf of said city, however, and has filed briefs in opposition to the writ prayed for, so far as the crossings of the railroads above or below the streets are concerned. He concedes that the Railroad Commission has jurisdiction and power to order the several railroads above named to establish and maintain a common depot and to cease the use of their respective depots as heretofore established and maintained. He contends that the Railroad Commission has no power to regulate or interfere with the use of public streets within the city of Los Angeles, that the exclusive control of such streets and railroad crossings is vested in said city, and that any order the Railroad Commission may make directing the establishment or maintenance of crossings, on, above, or below grade, of any street in the city of Los Angeles, would be subject to the power of the city to control and regulate the use of such street and crossing and to improve or change the same to promote the public convenience in the use of them. This presents the question involved in the case.

The Public Utilities Act of 1915, in defining the powers of the Railroad Commission, provides that:

"The commission shall have the exclusive power to determine and prescribe the manner, including the particular point of crossing, and the terms of installation, operation, maintenance, use and protection . . . of each crossing of a public road or highway by a railroad or street railroad and of a street by a railroad or *vice versa,* . . . and to alter or abolish any such crossing, and to require where, in its judgment, it would be practicable, a separation of grades at any such cross-

ing heretofore or hereafter established and to prescribe the terms upon which such separation shall be made and the proportions in which the expense of the alteration or abolition of such crossings or the separation of such grades shall be divided between the railroad or street railroad corporations affected or between such corporations and the state, county, municipality or other public authority in interest.'' (Stats. 1915, p. 137, sec. 43 [b].) The Public Utilities Act of 1911, of which the act of 1915 is a revision, contained precisely the same provision. (Spec. Sess. 1911, p. 40, sec. 43 [b].)

There can be no doubt that the above-quoted language is sufficient, in effect, if taken alone, to give to the Railroad Commission the powers over railroad crossings of streets which the plaintiffs herein seek to have the commission exercise. The contention of the city attorney is that the provisions of the city charter give the same powers to the city, and that the charter is paramount and superior to the Public Utilities Act as to the parts of the railroad lines lying within the city.

The conflicting provisions of the Constitution, the statutes, and the city charter of Los Angeles bearing upon the subject, and the frequency with which they have each been amended, tend to complicate the problem. It will be necessary to give a brief history of these provisions and the amendments thereof from the time of the adoption of the constitutional amendments in October, 1911, amending section 22 and inserting section 23 in article XII thereof.

As the mandate is sought to compel the commission to exercise jurisdiction in the future, and no rights have accrued by reason of a previous exercise thereof over the subject matter, our inquiry should extend to the law in force on the subject at the time of our decision. If in any respect the law relating thereto has been changed since this proceeding was begun, we should determine the jurisdiction of the commission as it exists under the law in force when our judgment is given. It appears to be necessary to consider at some length the law as it existed when the proceeding was begun, and the effect thereon of certain subsequent amendments of the Los Angeles charter.

At and before the time of the election on constitutional amendments in October, 1911, section 6 of article XI, as amended in 1896, provided, with respect to cities operating

under freeholders' charters, of which Los Angeles was one, that "all charters thereof framed or adopted by authority of this Constitution, *except in municipal affairs*, shall be subject to and controlled by general laws." This amendment, being later in date of adoption, would, to the extent of its application, supersede the provision of section 11, article XI, limiting the powers of cities to enact local police regulations to such as did not conflict with general laws. Section 11, therefore, does not affect this case. By a series of decisions it had become settled that the matter of opening, laying out, and improving streets and the regulation of the manner of their use were municipal affairs upon which the charter of any such city in so far as it made provision thereon, was paramount to general laws. (*Byrne* v. *Drain*, 127 Cal. 667, [60 Pac. 433] ; *Hellman* v. *Shoulters*, 114 Cal. 149, [44 Pac. 915, 45 Pac. 1057] ; *Sinton* v. *Ashbury*, 41 Cal. 531; *People* v. *Holladay*, 93 Cal. 248, [27 Am. St. Rep. 187, 29 Pac. 54].) With respect to matters not municipal, or municipal affairs upon which the charter was silent, the provisions of any general law pertaining thereto would control the subject. (*Fragley* v. *Phelan*, 126 Cal. 395, [58 Pac. 923].) But when the charter which was previously silent was amended so as to make a provision upon such municipal affair, that provision would immediately suspend the general law so far as the two were in conflict. (*Byrne* v. *Drain*, 127 Cal. 667, [60 Pac. 433].) On the other hand, if the charter made provision upon a subject not municipal, upon which the general law was silent, a subsequent statute relating thereto would immediately supersede the charter, so far as it was inconsistent therewith.

With the law so established, the aforesaid amendments of October, 1911, to the Constitution were adopted. The amendment of section 22, article XII, so far as it directly gave power to the Railroad Commission, merely repeated the pre-existing provisions of the section giving the commission power to establish passenger and freight rates for railroads and other transportation companies, to examine the books, records, and papers of such companies, hear and determine complaints against them, and prescribe a uniform system of accounts to be kept by them. It greatly enlarged the powers of the legislature over the subject by providing that the commission should have such additional powers of the same kind or different from those above mentioned, and not inconsistent therewith, as

should be conferred upon it by the legislature, and that "the authority of the legislature to confer such additional powers is expressly declared to be plenary and unlimited by any provision of this Constitution."

Section 23, article XII, extended the power of the Railroad Commission. It named many kinds of public service enterprises, each of which it declared to be a public utility, including every common carrier. This, of course, would include railroads. It provided that all such public utilities should be "subject to such control and regulation by the Railroad Commission as may be provided by the legislature," and that the right of the legislature "to confer powers upon the Railroad. Commission respecting public utilities is hereby declared to be plenary and to be unlimited by any provision of this Constitution." To this, however, there was added a proviso declaring that this section should not affect any "powers of control over any public utilities vested in any city and county, or incorporated city or town," and that until the qualified electors of such municipality, by popular vote at an election held for that purpose, determined to relinquish them, "such powers shall continue unimpaired." As common carriers were named in the list of "public utilities," it follows that the proviso includes powers vested in any city to control or regulate railroads. That this proviso was considered important is shown by the address to the people printed and distributed to the voters with the sample ballots previous to the election upon the amendments, in effect, stating that it was inserted to avoid opposition by voters residing in such cities who did not wish interference by the legislature with the powers already vested in the cities and to induce them to vote for the amendment.

In 1914 this section was amended by changing the proviso aforesaid by eliminating the words, "such powers of control over any public utility vested in any city, or incorporated city or town," and substituting the words, "such powers of control over public utilities as relate to the making and enforcement of local, police, sanitary and other regulations, other than the fixing of rates, vested in any city and county or incorporated city or town." This excepted the matter of fixing rates from the operation of the proviso, but left all other vested municipal powers free from interference, as before, until relinquished by popular vote. As the power to

fix rates is not here involved, this change is of no consequence to our discussion.

In 1914 sections 6 and 8 of article XI of the Constitution were also amended by inserting important changes in the provisions thereof relating to the adoption of freeholders' charters and the effect thereof. In section 6 the provision relating to municipal affairs was changed to read as follows:

"Cities and towns *hereafter* organized under charters framed and adopted by authority of this constitution are hereby empowered, and cities and towns *heretofore* organized by authority of this constitution may amend their charters in the manner authorized by this constitution so as to become likewise empowered hereunder, to make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in their several charters, and in respect to other matters they shall be subject to and controlled by general laws."

In section 8 this clause was inserted:

"It shall be competent in any charter framed under the authority of this section to provide that the municipality governed thereunder may make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws."

In December, 1916, when this proceeding was begun in this court, the city of Los Angeles had not availed itself of the privilege given to it by the aforesaid amendments to sections 6 and 8. Consequently, so far as its charter provided for municipal affairs, it was paramount to general laws, but upon municipal affairs for which it did not provide and upon affairs not municipal, it was still subject to the operation of general laws. But all of the powers to regulate public utilities which it possessed in October, 1911, except rate fixing, whether in matters municipal or general, remained in it unimpaired, by virtue of the aforesaid proviso of section 23, article XII, except in so far as its powers upon matters not municipal had been modified or taken away by general laws enacted, or charter amendments adopted, after October, 1911. We will presently state more fully the reasons for the last exception, as to the effect of general laws. The city charter in December, 1916, contained provisions giving the city power

to lay out, open, and improve streets and crossings within its limits and to control the manner of the ordinary use and occupation thereof. (Stats. 1911, p. 2061, sec. 1, subd. 13; Stats. 1905, p. 984, sec. 146, subd. 1.) These powers, as we have seen, come within the scope of municipal affairs upon which the charter is paramount, under section 6, article XI, and which, by the aforesaid proviso of section 23, remain unimpaired. They include the power to lay out and open streets across railroad tracks within the city and to condemn for that purpose the estate of the railroad company in the land constituting the intersection, subject to the operation of such railroad thereover. (*Los Angeles* v. *Central Trust Co.*, 173 Cal. 323, [159 Pac. 1169].) The charter also then contained provisions empowering the city to require the construction by such railroad companies of viaducts or subways at such crossings. (Stats. 1909, p. 1307, sec. 34.)

At that time, however, certain amendments of the Los Angeles charter previously adopted by the people were awaiting approval by the legislature. That approval was given on January 16, 1917, and on that day the amendments took effect. Section 2 was thereby amended by adding two subdivisions giving the city powers as follows:

"51. To make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in this charter."

"53. To require or provide for the elevation or depression, in whole or in part, of railway or railroad tracks. Nothing contained in this charter shall be construed as a prohibition or limitation of the right of the city to require or provide for such elevation or depression. . . . "

By subdivision 51, as will be observed, the city has brought itself within the conditions of the amendments of 1914 to sections 6 and 8 of article XI of the Constitution. Thereupon, according to the terms of those sections of the Constitution, its powers over municipal affairs became all-embracing, restricted and limited by the charter "only," and free from any interference by the state through general laws, including laws giving the Railroad Commission powers over public utilities. The result is that the city has become independent of general laws upon municipal affairs. Upon such affairs a general law is of no force with respect to Los Angeles. If its charter gives it powers concerning them, it has those

powers; if its charter is silent as to any such power, no general law can confer it. Whether such powers heretofore conferred upon it by general law, if any there be, are now abrogated or suspended, is a question we need not decide.

As these new constitutional provisions were adopted in 1914, at the same time as the proviso to section 23 of article XII, they are all of equal force in point of time. The effect of the several provisions where they are inconsistent is to be determined, as well as may be, by the established rules of statutory construction. If there is a special provision upon one branch of a subject, it will prevail over a general provision relating thereto, if the two are irreconcilable, unless the contrary intent appears from the context. (1 Sutherland on Statutory Construction, p. 529, sec. 275.) The provisions of sections 6 and 8 of article XI relate particularly to municipal corporations. The provisions of section 23 giving the legislature the right to confer additional powers upon the Railroad Commission are more general, and they only affect munipical affairs incidentally and where the operations of railroads take place within the limits of a municipal corporation. The express provision of section 23 that the power to fix rates in municipalities shall be vested in the Railroad Commission, if conferred upon it by the legislature, being a special provision on a specific subject, would, upon the rule of construction stated, be superior to the general provisions of sections 6 and 8 of article XI, exempting all municipal affairs from legislative control. But with respect to other municipal affairs, the provisions of sections 6 and 8 of article XI must prevail, and in all cities which have availed themselves of these provisions such municipal affairs will remain free from legislative interference, whether by means of an act giving power to the Railroad Commission or otherwise. The laying out, opening, and improving of streets and the ordinary uses thereof are municipal affairs, and therefore the provisions of the Los Angeles charter relating thereto are superior to those of the Public Utilities Act, as far as the two are inconsistent. Indeed, as the Constitution now reads, it is clear that even if the charter were silent, the legislature, after the amendment of 1917 to that charter, could not confer power upon the Railroad Commission to interfere with any municipal affairs of that city, other than rate-fixing, and that any powers heretofore given to the Railroad Commission by the

legislature respecting such municipal affairs must yield to the charter, regardless of the effect prior to such charter amendment.

It follows that the right and power of the Railroad Commission, under section 43 of the Public Utilities Act, to require state railroads such as those here involved, to establish viaducts or subways at street crossings in Los Angeles, will depend upon the question whether these regulations are municipal affairs, or matters of general state concern. We are of the opinion that they come within the latter designation, that they are not properly municipal affairs, but always have been, and still are, affairs properly to be controlled and regulated by state authority within as well as without any particular municipality. A railroad of this character obtains its general franchise and charter from the state. It files its articles of incorporation, under section 291 of the Civil Code, stating therein the place from and to which it is intended to be run, and thereupon, under the provisions of sections 465 to 494, inclusive, it becomes vested with the powers therein enumerated, subject to the specified limitations. These powers include the right to lay out its road upon the most advantageous route between the termini and to construct, maintain, and operate the same. With respect to incorporated cities it is provided that the right to use the same as a part of the right of such railway must be granted by a two-thirds vote of the town or city authority from which such right must emanate. This originally was the only provision giving any municipal corporation any power respecting these railroads. These rights and powers were given by the general law and were conferred for the general benefit of the state and not for the exclusive or special benefit of cities or towns. This general railroad law was embraced in the Civil Code as enacted in 1872. The Constitution of 1879 (section 17, article XII), provided that "all railroad, canal, and other transportation companies are declared to be common carriers, and subject to legislative control. Any association or corporation, organized for the purpose, under the laws of this state, shall have the right to connect at the state line with railroads of other states. Every railroad company shall have the right with its road to intersect, connect with or cross any other railroad, and shall receive and transport each the other's passengers, tonnage, and cars, without delay or discrimination." This was the open-

ing section of the part of the article relating to railroad and transportation companies, supervision of which was thereby given to the then newly created Railroad Commission. The context of these sections, from 17 to 22, inclusive, as originally adopted, show that the words "railroad and other transportation companies" as there used did not include street railroads or other transportation companies operating exclusively in a city for local purposes. (*Board of Railroad Commrs. v. Market St. Ry. Co.*, 132 Cal. 677, [64 Pac. 1065]; *Western Assn. v. Railroad Commission* (Cal.), 162 Pac. 391.) The sections did include and particularly provide for the supervision of railroads of the character here involved. The declaration of section 17 that these railroads should be "subject to legislative control" shows that they are matters of state concern. As such railroads serve the people of the entire state as means of communication and transportation, it is apparent that it would not be to the interest of the state to leave them subject to the exclusive and unlimited control of every city through which they may pass, with respect to the construction, maintenance, and operation of the lines lying within such city, whenever the city may desire to free itself from control over municipal affairs by complying with the amendments of 1914 to article XI of the Constitution. The effect of these sections of article XII to make such railroad system state affairs is similar to that of article IX with respect to the public school system. Article IX, we have held, "makes the management and control of the public schools a matter of state care and supervision." (*Kennedy v. Miller*, 97 Cal. 431, [32 Pac. 558].) "The school system is a matter of general concern and not a municipal affair." (*Hancock v. Board of Education*, 140 Cal. 554, 561, [74 Pac. 46].) The conclusion on this subject necessarily must be that the right of the legislature, under sections 17, 22, and 23, article XII, of the Constitution, to commit the regulation of these railroads, so far as they operate within the cities, to the exclusive control of the Railroad Commission, is not a matter which can be classed as a municipal affair, but is a matter of general concern, and the legislative declarations on the subject are paramount to any city charter.

It will be observed that the reservation in the proviso of section 23 to all cities of the powers theretofore vested in them is general, and embraces all powers of local police regu-

lation over public utilities, except rate-fixing, then vested in such cities, including those relating to matters of general concern as well as those relating to municipal affairs. From this it would follow that the powers of this character then vested in Los Angeles, by its charter, to regulate and control the state railroads in their operations and street crossings within the city, would also be reserved to the city and would remain unimpaired. Such power appears to have been vested in the city in October, 1911, by section 34 of its charter, above mentioned, and by subdivisions 30 and 38 of section 2 of its charter as amended on March 25, 1911. (Stats. 1911, pp. 2063, 2065.) (Section 15 of the act of February 9, 1911, so far as it relates to crossings of "public roads and highways," was, in our opinion, intended to apply only to crossings outside of cities, and it did not operate to divest Los Angeles of such powers within that city.) 'But notwithstanding this comprehensive effect of the proviso, if taken alone and literally, we think that when considered in connection with the language of section 6 of article XI, defining the tenure upon which cities hold powers over matters not municipal in character, a clear distinction appears by virtue of which such powers may be divested by a general law. By the terms of section 6, article XI, powers vested in a city by a freeholders' charter, to regulate affairs not municipal in character, were not absolute, but were "subject to and controlled by general laws." Such powers, therefore, are granted upon the condition and subject to the qualification that they must yield to and be suspended by a general law inconsistent therewith, whenever such general law shall be enacted. The city holds its powers of this character subject to this condition. Such power would, therefore, be divested by the happening of the condition. So far as a power of this character is reserved to the city by the proviso of section 23, it is reserved with the conditions upon which it was granted inhering in it. The reservation was not intended to destroy or annul the terms of the grant by which such power became vested in the city, or remove the condition subsequent, but only to hold it as it was and leave the power, as before, subject to suspension upon the passage of a general law inconsistent therewith.

Herein is to be noted a distinction between the law involved in this case and the law existing when the case of *Los Angeles* v. *Central Trust Co.,* 173 Cal. 323, [159 Pac. 1169], arose,

and upon which it was decided.    The Public Utilities Act of December 23, 1911, was the law then in force.    Section 82 thereof made the same reservation of powers vested in cities over public utilities as that contained at that time in the proviso of section 23, article XII, of the Constitution.    Therefore that act did not suspend or supersede the charter provisions granting such powers to the city, but reserved them untouched.    The Public Utilities Act of 1915 omits this reservation.    Consequently, with respect to affairs not municipal, upon the rule just stated, it supersedes all grants of power by the city charter which are inconsistent with the act.    It is to be further remarked that the case of *Los Angeles* v. *Central Trust Co.* did not involve the right of the Railroad Commission to order a railroad company to change or improve its crossing of a street, but only the right of the city to open a street across an existing railroad and to condemn the necessary property therefor, without first obtaining permission to do so from the commission.    It was the power of the city to open streets, and thus make a railroad crossing, that was there in dispute, and not the power of the commission, then or afterward, to regulate the conduct of the railroad company at such crossings or to compel a change in the mode thereof. The opinion, properly understood, does not state any rule as to the latter power.

The effect upon the present case may be stated as follows: The city of Los Angeles has the power to open, widen, extend, and improve streets and to regulate the ordinary uses thereof.    The Railroad Commission, under section 43 of the Public Utilities Act, has the power to make orders, which are binding upon the railroad companies under its supervision, to abolish grade crossings of the public streets of a city, and to order a separation of grades so that the railroad and street shall not be upon the same level, and generally to exercise the powers specified in that section.    It cannot vacate the street or direct a cessation of the public use thereof.    Its orders are to be directed to the railroad company and not to the city, except so far as may be necessary to apportion the expense of construction and maintenance of the particular mode of crossing which shall be required.    The city has the power to alter the construction of its streets at such crossings, or any of them, by elevating them upon a viaduct so as to pass over the railroad, or by making a subway passing under

the railroad. In either case, if the change in the street does not interfere with the operation and use of the railroad at the time, the commission cannot prevent the change, and it may be made without the consent of the commission. But if it does interfere, either at the time or afterward, whether by natural causes, or lack of repair of the street as changed, or by reason of changes in the construction or use of the railroad subsequently directed or approved by the commission, the city must conform to the orders of the commission so as to avoid such interference.

It is ordered that the Railroad Commission proceed to consider and determine, upon the merits, the complaints made to it by the plaintiffs herein, and that a writ of mandate be issued to it in accordance herewith.

Henshaw, J., Sloss, J., Melvin, J., Lorigan, J., and Angellotti, C. J., concurred.

Rehearing denied.