[L. A. No. 6249. In Bank.—February 20, 1920.]

MARY H. MORGAN, Plaintiff and Appellant, v. THE CITY OF LOS ANGELES (a Municipal Corporation), et al., Defendants and Respondents; MARY RIDEOUT, Intervener and Appellant.

[1] MUNICIPAL CORPORATIONS — LOS ANGELES — ISSUANCE OF BONDS UNDER MUNICIPAL BOND ACT OF 1901—CHARTER.—The city of Los Angeles under the amendment of January 15, 1919, to subdivision 51 of section 2 of article I of its charter, providing that the city shall have the right and power to make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in the charter, and to exercise any and all rights, powers, and privileges prescribed by the general laws of the state, is empowered to issue bonds under the provisions of the Municipal Bond Act of 1901.

[2] ID.—MUNICIPAL BONDED INDEBTEDNESS—SPECIAL ELECTION—CONSOLIDATION WITH GENERAL ELECTION — NECESSARY MAJORITY. — In view of section 12¾ of the Bond Act, as amended in 1915 (Deering's General Laws 1915, p. 1155), which authorizes the consolidation of a special election for the purpose of authorizing the issuance of bonds with a general election, a bond issue is authorized by a two-thirds majority of the entire vote cast upon the bond proposition at such a consolidated election, although less than two-thirds of all the votes cast at the election.

APPEAL from a judgment of the Superior Court of Los Angeles County. Grant Jackson, Judge. Affirmed.

The facts are stated in the opinion of the court.

Overton, Lyman & Plumb and Wm. B. Himrod for Plaintiff and Appellant.

Charles S. Burnell, City Attorney, and Clyde M. Leach, Deputy City Attorney, for Defendants and Respondents.

Edgar G. Pratt and Henry M. Willis for Intervener and Appellant.

LAWLOR, J.—This is an appeal from a judgment entered in favor of the defendants upon an order of the trial court sustaining, without leave to amend, a general demurrer to the plaintiff's complaint, and to the complaint in intervention filed by permission of the court, in an action brought by the plaintiff, as a taxpayer, to obtain a judgment that a certain bond issue of the city of Los Angeles amounting to four million five hundred thousand dollars was unauthorized, invalid, and void, and to restrain the city and its officers from issuing such bonds or expending any part of the proceeds thereof for any purpose. Both the plaintiff and the intervener have appealed, and by stipulation the record on both appeals is brought before the court in a single transcript.

The material facts as alleged in the plaintiff's complaint are as follows:

Proceedings were instituted by the city of Los Angeles to incur a bonded indebtedness of four million five hundred thousand dollars for certain municipal improvements, to wit: The acquisition, construction, and completion of docks, wharves, and other harbor improvements in the city of Los Angeles. A resolution declaring the necessity for such improvement was adopted by the city council on April 8, 1919. On April 24, 1919, the council adopted an ordinance, designated as Ordinance No. 38878 (New Series) of the city of Los Angeles, calling a special election for the purpose of voting on the proposed bond issue. Section 5 of the ordinance contained the following provision in regard to holding the election:

"That the election hereby called shall be and the same hereby is consolidated with the primary nominating election heretofore called and ordered by the Council of the city of Los Angeles to be held on said Tuesday, the 6th day of May, 1919, by Ordinance No. 38867 (New Series)."

It is further alleged that the primary nominating election was held on May 6, 1919, and that the special bond election was consolidated with such primary nominating election; that at such consolidated election there was but one polling place, one set of election officials, one ballot-box, one roster of voters, one poll list, one list of assisted voters, one list of challenged voters, and but one tally list, entitled "Tally List of Primary Nominating Election," used in each precinct; that there was but one ballot furnished to each elector and that such ballot contained the names of the various nominees for the city offices, and also contained the proposition for the incurring of said bonded indebtedness for the use and purpose set forth in the ordinance calling the special election. It is also alleged that the total number of votes cast at the primary nominating election was 63,511; that the total number cast on the proposition to incur the bonded indebtedness in question was 51,974; that the number of votes cast in favor of this proposition was 37,013, and the number against it was 14,961. It is then alleged that the city council wrongfully and erroneously declared that the proposition of incurring said indebtedness had received the approval of the requisite number of electors of said city and that the said proposition had carried and that the bonds designated in the ordinance calling the election had been authorized. It is further alleged that since the election the city council has adopted an ordinance providing for the issuance of said bonds and directing the mayor and the treasurer of the city to sign the bonds and the clerk to countersign them and affix the corporate seal of the city; that the officials of the city threaten to and will, unless restrained, print, issue, and sell and deliver such bonds and create a bonded indebtedness and levy a tax for the payment of the bonds. "Wherefore plaintiff prays that defendants and each of them be enjoined and restrained from proceeding further, or at all, with the printing and issuance, or signing or sale or delivery of said bonds, and from expending any part of the proceeds of said bonds for any purpose, and that the bonds purported to be authorized at said election be held to be unauthorized, invalid and void, and for such other and further relief as to the court may seem meet and equitable."

The complaint in intervention is in most respects the same as that of the plaintiff, except that the intervener alleges in addition that the city officers in the matter of this bond issue purport to have acted under what is known as the Municipal Bond Act, approved February 25, 1901, and the amendments thereof (Deering's General Laws, 1915, p. 1151), and that the said officials in taking such action exceeded the power vested in them by the city charter and the constitution and the laws of the state of California, for the reason that the city of Los Angeles has not at any time by any affirmative action or otherwise adopted the said Municipal Bond Act of the state of California as a law of said city of Los Angeles.

In her prayer the intervener asks for the same relief as the plaintiff, and, in addition, that the court decree that the "pretended special municipal election purported to have been held May 6, 1919, was, and is, in all respects void."

The only question before the court is whether either the plaintiff's complaint or the complaint in intervention states a cause of action. The points raised on appeal by the appellant are:

"First: That the purported bond issue is void and of no force or effect for the reason that in order for such bonds to be authorized an affirmative vote of two-thirds of all the electors voting at the consolidated election was required and not merely a two-thirds vote of those voting on the proposition.

"Second: That the city of Los Angeles has no power or authority under its charter to take advantage of the Municipal Bond Act until after some affirmative action has been taken by the city adopting such Municipal Bond Act as a part of the law governing such city."

In addition to these two points the intervener urges a third ground why the bonds should be declared invalid, which is as follows:

"In order to incur the proposed indebtedness it is necessary that the bonds receive the approval of two-thirds of the qualified electors of the city."

1. We shall consider first the contention of appellants that the city of Los Angeles had no power or authority under its charter to take advantage of the Municipal Bond Act until after some affirmative action had been taken by the city

adopting such act as a part of the law governing the city. Appellants claim and respondents concede that the issuance of these bonds is a municipal affair and that the charter of the city contains no provisions governing the procedure to be followed in their issuance. Section 6 of article XI of the constitution of the state, as amended in 1914, reads as follows:

"Cities and towns hereafter organized under charters framed and adopted by authority of this constitution are hereby empowered, and cities and towns heretofore organized by authority of this constitution may amend their charters in the manner authorized by this constitution so as to become likewise empowered hereunder, to make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in their several charters, and in respect to other matters they shall be subject to and controlled by general laws."

In compliance with the provisions of this section, the city of Los Angeles, in 1917, amended article I of its charter to read:

"Sec. 2. The city of Los Angeles, in addition to any other power held by it, or that may hereafter be granted to it under the constitution or laws of the state, shall have the right and power: . . .

"51. To make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in this charter."

In the case of *Civic Center Assn.* v. *Railroad Commission,* 175 Cal. 441, [166 Pac. 351], these provisions of the constitution and the charter were presented for construction. It was there said: "By subdivision 51, as will be observed, the city has brought itself within the conditions of the amendments of 1914 to sections 6 and 8 of article XI of the constitution. Thereupon, according to the terms of those sections of the constitution, its powers over municipal affairs became all-embracing, restricted and limited by the charter 'only,' and free from any interference by the state through general laws, including laws giving the Railroad Commission powers over public utilities. The result is that the city has become independent of general laws upon municipal affairs. Upon such affairs a general law is of

no force with respect to Los Angeles. If its charter gives it powers concerning them, it has those powers; if its charter is silent as to any such power, no general law can confer it. Whether such powers heretofore conferred upon it by general law, if any there be, are now abrogated or suspended, is a question we need not decide.''

Following the decision in the Civic Center case, the city of Los Angeles on January 15, 1919, amended subdivision 51 of section 2 of article I of the charter so as to provide:

''51. To make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in this charter; *provided, however, that nothing herein shall be construed to prevent or restrict the city from exercising or consenting to, and the city is hereby authorized to exercise, any and all rights, powers and privileges heretofore or hereafter granted or prescribed by general laws of the state.''* (Italics ours.)

This charter provision was in effect at the time the city initiated the bond proceedings in question, and respondents contend ''that the plain intent of the provision is to the effect that, if the city is independent of general laws upon municipal affairs, save only as it may be restricted or limited by its own charter, it has the power to *exercise* any right, power or privilege heretofore or hereafter granted or *prescribed* by general law, and nothing in the charter shall be construed to *prevent* or *restrict* the city from *exercising* or *consenting* to such right, power or privilege.'' [1] This contention is, in our opinion, sound, and it must be held that under subdivision 51 of section 2 of article I of its charter, as amended in 1919, the city of Los Angeles was empowered to issue bonds under the provisions of the Municipal Bond Act of 1901.

2. In urging that an affirmative vote of two-thirds of all the electors voting at the consolidated election was required to authorize such bonds, the position of the appellants is thus stated in the opening brief: ''We will assume in this part of our argument that the city had the power under its charter to utilize the Municipal Bond Act; 63,511 electors voted at the consolidated election on May 6, 1919, 51,974 electors voted on the bond proposition, 37,013 of whom voted in favor of the bonds and 14,961 of whom voted against the bonds. It is at once apparent that the affirma-

tive vote in favor of the bonds was more than two-thirds of all the votes cast on the proposition, but was less than two-thirds of all the votes cast at the consolidated election. It is the contention of the plaintiff that in order for the bonds to be authorized, two-thirds of all the voters voting at the consolidated election must have voted in favor of the proposition. Under the facts in this case there can be no question but that one election, and only one, was held in Los Angeles on May 6, 1919. This being the fact, our position in regard to the number of affirmative votes required is abundantly sustained by the authorities." With this contention we cannot agree.

Section 18 of article XI of the constitution provides: "No . . . city . . . shall incur any indebtedness or liability in any manner or for any purpose exceeding in any year the income and revenue provided for such year, without the assent of two-thirds of the qualified electors thereof, . . . *at an election to be held for that purpose. . . .*" (Italics ours.) Section 2 of the Bond Act of 1901 (Deering's General Laws, 1915, p. 1151), provides that the city council may, after adopting a resolution of necessity, "order the submission of the proposition of incurring a bonded debt for the purpose set forth in said resolution, to the qualified voters of said city, . . . *at an election held for that purpose.*" Section 3 of the same act provides: "It shall require the votes of two-thirds of all the voters *voting at such election* to authorize the issuance of the bonds . . ." (Italics ours.)

It is clear from the foregoing provisions that a bond proposition can only be submitted to the qualified electors at an election *held for that purpose,* that is to say, such questions can only be submitted at a special election. As has already been indicated, a special election was called in this instance. And we have also pointed out that the special election was consolidated with the primary election which was held on May 6, 1919. Such consolidation is authorized by section 12¾ of the Bond Act, as amended in 1915 (Deering's General Laws, 1915, p. 1155). This section merely provides a means of saving the expense of holding a separate election by permitting a bond election to be held at the same time and place as any other election authorized by law at which the same qualified electors are entitled to vote. It

specifically requires that all the provisions of the act relating to the procedure for the calling and holding of the bond election must be complied with, except that the ordinance calling the bond election may provide that the election precincts, polling places, and officers of election shall be the same as those set forth in the ordinance calling the other election by reference to such ordinance without setting them forth in the ordinance calling the bond election. This, we think, clearly shows an intention on the part of the legislature to preserve the status of the bond election as a special election held for that purpose, and is not such a consolidation as to result in a complete joining together or uniting of the two elections to such an extent that a voter voting at the other election and not at the bond election can be said to have expressed an opinion on the bond proposition and by his silence have voted against it. Only by viewing the question in this light can section 12¾ be reconciled with the requirements of the preceding sections and the constitution that bond propositions must be submitted at an election *held for that purpose,* and that it shall require the votes of two-thirds of the voters voting *at such election* to authorize the issuance of the bonds. A qualified elector does not become a voter until he has cast a vote, and if he does not vote on the bond issue he is not a voter voting at the election held for that purpose. Every qualified elector who presented himself at the polls on May 6, 1919, was given a ballot with the bond proposition printed thereon, the same as he would have received if the bond election had been held on any other day. The mere fact that on the same ballot appeared the names of the candidates for office in no way could influence or affect the will or wish of the elector in expressing his opinion on the bond issue. He could vote "yes" or he could vote "no," or he could remain silent and express no choice one way or the other, as in fact 11,537 electors did on this occasion. We know of no principle of law which holds that those who express no choice can be said to have voted "no." Yet it would be necessary to adopt this principle if we are to give effect to the contention of the appellants in this behalf and hold that the two-thirds majority required to carry the bond issue in the present case means two-thirds of all the electors who voted at the primary election which was consolidated with the bond election.

A situation very similar to the one presented in the instant case was before this court in the case of *Howland* v. *Board of Supervisors,* 109 Cal. 152, [41 Pac. 864]. In that case the proposition of authorizing the issuance of bonds for a county hospital, poor-house and farm was printed on the ballot used at the general state election held on November 8, 1892. The proposition was submitted under the provisions of section 37 of the act of 1891 (Stats. 1891, p. 310), which provides that the question of the issuance of bonds shall be submitted to the qualified electors of the county "at the next general election, or at a special election to be called by the board for that purpose. . . . If two-thirds of the electors of the county voting at such election shall vote in favor of issuing the bonds, and not otherwise, the board may proceed to issue the amount of bonds specified." The court there said:

"1. It is insisted that two-thirds of the qualified electors of the county of San Joaquin voting at the general election November 8, 1892, did not vote in favor of the issuance of these bonds, and for that reason the proposition to issue was defeated. The returns of the general election show that six thousand five hundred votes were cast thereat; that 3,880 electors voted in favor of the issuance of bonds, and 1,006 voted against their issuance; and it thus clearly appears that, if two-thirds of all the votes cast were necessary to legally justify the board of supervisors in the issuance of the bonds, then the proposition was defeated. But does the law so declare? The foundation of the entire proceeding may be found in article XI, section 18, of the Constitution of this state, which provides: " 'No county . . . shall incur any indebtedness or liability in any manner or for any purpose exceeding in any year the income and revenue provided for such year, without the assent of two-thirds of the qualified electors thereof, voting at an election to be held for that purpose.'

"If there had been no general election held at the same time this bond election was held, there would be no question but that two-thirds of the qualified electors of the county voting assented thereto, and the fact that the county, by its board of supervisors, embraced the privilege extended to it by the legislature, by the act of 1891, and held the election upon the day and at the same place as the general election, we think wholly immaterial. The constitution pro-

vides that the voting upon the proposition must be done at an election held *for that purpose,* and, if there was not an election held upon this day for the purpose of allowing. the qualified electors of San Joaquin County an opportunity to express their opinions upon this proposition, then it would be impossible to submit the question to the electors at a general election. This cannot be true, and it is quite evident that there was an election held for the purpose of submitting the proposition to the qualified electors of San Joaquin County. At that election 3,880 votes were cast in favor of the issuance of the bonds, and 1,006 votes against such issuance. It follows that two-thirds of the qualified electors of the county voting at an election held for the purpose assented to the incurring of the indebtedness and the issuance of the bonds, and that the constitutional provision in this regard is satisfied.

"If additional argument were necessary to sustain a construction already quite plain, it may be suggested that the election held upon this day, as far as the bond question is concerned, was a special election. The election was called by proclamation of the board of supervisors of San Joaquin County, for a single, definite purpose, and, *ex necessitate,* was a special election, and the votes cast for and against the issuance of bonds were all the votes cast at that election. As already suggested, the fact that the legislature granted the county the right to use the machinery of the state in conducting the election, if it so desired, and that it embraced the right granted, in no way changes the legal aspect of the case. There is no authority cited, and we know of none, opposed to this conclusion."

[2] This, we think, is a correct statement of the law on the point here presented. So far as we are able to determine, the exact question has not been presented in this jurisdiction since the decision in the Howland case. The supreme court of Oregon, however, in *Wilson* v. *Wasco County,* 83 Or. 147, [163 Pac. 317], entered into an exhaustive discussion of the subject in construing a statute which required a "majority of the voters voting at such election" to authorize the issuance of bonds, in a case where a bond proposition was submitted at a general election. The court quoted with approval from the Howland case and followed with a quotation from *Fox* v. *City of Seattle,* 43 Wash. 74, [117 Am.

St. Rep. 1037, 86 Pac. 379], wherein the court, discussing the same question, said: "It will be observed that the constitution requires propositions of this kind to be submitted to a vote at an election *to be held for that purpose.*' This is, in effect, providing a special election for the submission of questions of this kind, and if all the requirements of a special election are met . . . by giving proper notice, etc., the fact that for the sake of economy the election was held on the same day that a general city election was held, and that the same ballots were used, does not make it a general election, or take it out of the provision of the constitution above quoted, viz., that such proposition must be submitted at an election *to be held for that purpose,* but that the election on the special proposition being so held is merely an incident not affecting in any manner its distinct purpose or character." (See, also, *Strain* v. *Young,* 25 Wash. 578, [66 Pac. 64]; *State* v. *Blaisdell,* 18 N. D. 31, [119 N. W. 360]; *Montgomery County .etc.* v. *Trimble,* 104 Ky. 629, [42 L. R. A. 738, 47 S. W. 773]; *State* v. *State Board of Canvassers* (N. D.), 172 N. W. 80.)

The principal cases cited and relied on by the appellants are: *City of Santa Rosa* v. *Bower,* 142 Cal. 299, [75 Pac. 829]; *Law* v. *City and County of San Francisco,* 144 Cal. 384, [77 Pac. 1014], and *City of Long Beach* v. *Boynton,* 17 Cal. App. 290, [119 Pac. 677]. These cases are plainly distinguishable from the cases above cited and have no application to the case at bar.

In *Santa Rosa* v. *Bower, supra,* the question arose out of the fact that at a general municipal election held in the city of Santa Rosa there was submitted a new city charter for adoption under the provisions of. section 8, article XI, of the constitution, which read: "It [the charter] shall be submitted to the qualified electors of said city *at a general or a special election,* and if a majority of such qualified electors *voting thereat* shall ratify the same, it shall thereafter be submitted to the legislature for its approval or rejection as a whole, without power of alteration or amendment." (Italics ours.) The court held that the proposition having been submitted at a general election, a majority of all the votes cast at the election for all purposes was necessary to ratify the charter. It is interesting to note that in 1902 the above provision of the constitution was amended

by substituting the word "thereon" for "thereat." In the course of the decision in that case it was said:

"The case is clearly distinguishable from that of *Howland* v. *Supervisors,* 109 Cal. 152, [41 Pac. 864], where the constitutional provision relative to the incurring by a county of an indebtedness in excess of the income and revenue of the year, provided that such indebtedness could not be incurred 'without the consent of two-thirds of the qualified electors thereof voting at an election *to be held for that purpose.'* The mere fact that such question was in that case submitted at a general election did not make the election as to such question any less a special election 'held for that purpose' than if the proposition had been submitted by itself at another time, and the assent of two-thirds of the qualified electors voting *on the proposition of the indebtedness* was held sufficient. . . .

"In the case at bar the language of the constitutional provision does not call for an election 'for the purpose' of determining the question, but expressly allows the question to be submitted 'at a general or special election,' and in terms requires that, whether submitted at a general or special election, it must receive the assent of a majority of the qualified electors voting at the election."

The case of *Long Beach* v. *Boynton, supra,* involved proceedings taken under the Bond Act of 1901, before the adoption of section 12¾ and at a time when bond propositions could be submitted at a special election only at which bond questions alone could be submitted, and provided that propositions for incurring indebtedness for more than one object or purpose might be submitted at the same election. It was there held that it made no difference how many separate propositions were submitted at such election, but it would be necessary for each to get two-thirds of all the votes cast at the election in order to carry.

In the case of *Law* v. *San Francisco, supra,* a situation very similar to that in the Boynton case was presented. There a special election was called for the purpose of voting on ten separate bond propositions under the provisions of the San Francisco charter (section 4, article XII), which provided that the board of supervisors shall submit the questions at a special election called for the purpose, and "at least two-thirds of the electors voting at such special election shall

be necessary to secure the acquisition of such public utility or utilities, and to warrant the issuance of municipal bonds therefor.'' It was held there, as in the Boynton case, that the law required that two-thirds of all the votes cast at the election shall be in favor of any single proposition before it can be said to have carried.

The proceedings in the present case were had under a different law, one which, as we have seen, requires a special election to be held for the purpose of voting bonds, which requires an affirmative vote of two-thirds of all the voters voting at such election to authorize the issuance of the bonds, and which authorizes such special election to be held at the same time and place with any other election where the same qualified electors are entitled to vote. Both upon principle and upon the authority of the Howland case and the decisions which follow the rule there laid down, it must be held that there was a special election held on May 6, 1919, for the purpose of voting on the proposition of a bonded indebtedness in the city of Los Angeles and that the bonds in question did receive the necessary two-thirds vote.

In view of the conclusion we have reached it will not be necessary to consider the contention of the intervener that ''in order to incur the proposed indebtedness it is necessary that the bonds receive the approval of two-thirds of the qualified electors of the city.''

The judgment is affirmed.

Shaw, J., Wilbur, J., Lennon, J., Kerrigan, J., *pro tem.,* and Angellotti, C. J., concurred.

OLNEY, J., Concurring.—I concur. I would say, however, that I do not agree with the assumption of the main opinion based on isolated language from the opinion in *Civic Center Assn.* v. *Railroad Commission,* 175 Cal. 441, [166 Pac. 351], that a general law in regard to municipal affairs is not operative in Los Angeles or any other similarly chartered city unless picked up by the city charter and affirmatively made a part of the municipal law of the city. Such is not, in my judgment, the effect of section 6 of article XI of our constitution, as amended in 1914.

The section as it originally· read provided that all municipal charters should be subject to and controlled by general laws. Under this reading it was held that in case of any con-

flict between the provisions of a city charter and a general law the latter should prevail. To obviate this the section was amended in 1896 so as to provide that city charters should be subject to and controlled¹ by general laws except in municipal affairs. The result was that thereafter, in case of conflict between charter provisions and a general law, the former prevailed.

The amendment, however, affected only cases of conflict between charters and general laws. It did not affect or change the rule in cases of conflict between general laws and municipal ordinances or other attempted exercise of municipal power upon matters as to which the city charter was silent. In case of such a conflict the general law still prevailed, since there was no conflict between it and the charter. (*Fragley* v. *Phelan*, 126 Cal. 395, [58 Pac. 923]; *Clouse* v. *San Diego*, 159 Cal. 434, [114 Pac. 573].)

To obviate this condition, the constitutional section was again amended in 1914 to read as at present. It provides that cities by their charters may be authorized "to make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in their several charters." The intent and effect of this amendment is very clearly to make municipal ordinances and exercises of power as to municipal affairs prevail over general laws in case of conflict between them. But there is nothing in its language and nothing in its history which requires or justifies the assumption that it destroys the operation of general laws within chartered cities where there is no conflict between them and the municipal laws or regulations of the city, even though the subject dealt with be a "municipal affair." By the constitutional provision as it now reads chartered cities may be wholly independent as to what laws or regulations they may wish to adopt in municipal affairs, but unless they adopt laws or regulations which are in conflict with general laws on the same subject, the latter should still operate both within and without the cities by virtue of the fact that they are general laws of the state of which the cities are still a part.