BISHOP, J.
 

 Before a trial began, the defendant obtained the dismissal of the complaint which charged that he had operated a passenger bus of the Bay Cities Transit Company in violation of Los Angeles City’s initiative ordinance numbered 58198, adopted June 7, 1927. As we are of the opinion that the ordinance is now ineffective, because directly in conflict with the superior authority vested in the state railroad commission, the order of dismissal, from which the People have appealed, must be affirmed.
 

 There is no doubt that the legislature has endeavored to give the railroad commission exclusive authority in the field in which the ordinance attempts to function. By the terms of the ordinance it is stated that the city’s board of public utilities and transportation may issue a permit to operate a motor bus (defined as being a motor-propelled vehicle for public use in the transportation of persons, for compensation, over any public street in the city, whether operated wholly or partly within the city) if the board shall declare that the public convenience and necessity require its operation. The board is also authorized, according to the terms of the ordinance, to revoke a permit which it has granted. A person who operates a motor bus after a permit has been revoked and before another has been granted (the charge made against the defendant) is declared to be guilty of a misdemeanor. By other provisions of the ordinance,
 
 *Supp. 732
 
 further conditions respecting the operation of busses are either prescribed or authorized. By appropriate definitions added to the Public Utilities Act (Act 6386, Deering’s Gen. Laws 1937) by the Statutes of 1927, page 73, the “motor bus" of the city’s ordinance becomes the “passenger stage" of the Public Utilities Act, and “a passenger stage corporation" is declared to be “every corporation, or person . . . engaged as a common carrier, for compensation, in the . . . operation or management of any passenger stage over any public highway in this state between fixed termini or over a regular route; provided, however, that this term shall not include those whose operations are exclusively within the limits of a single incorporated city". These definitions plainly encompass the Bay Cities Transit Company, whose bus, according to the complaint, was being operated by the defendant over a route between points within the city and points outside, which route had been approved by the railroad commission in a certificate issued by it. The provisions of section 50¼, added to the Public Utilities Act by the same statute that defined “passenger stage corporation" are pertinent, therefore, which, after providing that no passenger stage corporation shall operate without a permit from the railroad commission, continue: “The railroad commission, in the exercise of the jurisdiction conferred upon it by the Constitution of this state and by this act, shall have power and authority to grant certificates of public convenience and necessity and make decisions and orders and to prescribe rules and regulations affecting passenger stage corporations, notwithstanding the provisions of any ordinance or permit of any incorporated city or town, city and county, or county and in case of conflict between any such order, rule or regulation, and any such ordinance or permit, the certificate, decision, order, rule or regulation of the railroad commission shall in each instance prevail."
 

 The position of appellant is, that in spite of the explicit declaration of the legislature to the contrary the city has the power to make and now enforce the ordinance in question. Recognizing that the Constitution declares that the power of the legislature to confer authority on the railroad commission, respecting public utilities, is plenary, the appellant points out that there are other provisions of the Constitution, which must also be given effect, and that
 
 *Supp. 733
 
 these save to the city the power embodied in the ordinance whose terms the defendant violated.
 

 The first provision on which the appellant relies is the third sentence of section 19, article XI, placed in the Constitution in 1911. We quote the first two sentences also to furnish the context for the third: “Any municipal corporation may establish and operate public works for supplying its inhabitants with light, water, power, heat, transportation, telephone service or other means of communication. Such works may be acquired by original construction or by the purchase of existing works, including their franchises, or both. Persons or corporations may establish and operate works for supplying the inhabitants with such services upon such conditions and under such regulations as the municipality may prescribe under its organic law, on condition that the municipal government shall have the right to regulate the charges thereof. ’ ’
 

 It can hardly be contended that the third sentence of section 19, article XI, is a grant of power to a city, except possibly with respect to rates, a subject-matter that does not concern us in this case. What it is, and this suffices to give it meaning, is the approval of the establishment and operation of “works” by persons and corporations, and the recognition that a city’s organic law may authorize it to prescribe the conditions and regulations under which the works may be established and operated. A city’s “organic law” may be found in one or more of three places. A general state statute may constitute all or a part of a city’s organic law. If it does, it is, of course, subject to limitations at the hands of the legislature expressed in other statutes. The Constitution itself, in so far as it grants powers to cities, may be considered a part of their organic laws, as has been recognized with respect to the familiar and pertinent provisions of section 11, article XI.
 
 (In re Ackerman,
 
 (1907) 6 Cal. App. 5, 9 [91 Pac. 427].) But note the limitation explicit in this section 11: “ Any county, city, town, or township may make and enforce within its limits all such local, police, sanitary and other regulations as are not in conflict with general laws.” If the local ordinance conflicts, with a state statute, the latter controls even though the ordinance was valid when adopted and the conflicting statute came after.
 
 (In re Desanta,
 
 (1908) 8 Cal. App. 295 [96 Pac. 1027] ;
 
 In re Hoffman,
 
 (1909) 155 Cal.
 
 *Supp. 734
 
 114 [99 Pac. 517, 132 Am. St. Rep. 75].) A third source of the organic laws of a city is its charter, if it has one. Here, for the first time, we find the possibility of a power to prescribe the conditions and regulations under which persons and corporations may establish and operate their works, that is not subject to legislative control. Section 8 of article XI determines the manner in which cities may obtain charters, and, since 1914, provides: “It shall be competent in any charter framed under the authority of this section to provide that the municipality governed thereunder may make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws.” Section 6, article XI, contains a similar provision: “cities . . . may amend their charters ... so as to become likewise empowered hereunder, to make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in their several charters, and in respect to other matters they shall be subject to and controlled by general laws”.
 

 We need not tarry to wonder whether the defendant’s employer established and operated' “works”, to bring it within section 19, article XI. Let us say that it did, and that the section recognizes the possibility that a city’s organic law may authorize it to impose conditions and regulations on such a one as defendant’s employer. It is nevertheless true that the organic law is subject to and controlled by conflicting state legislative action unless the subject-matter is a “municipal affair” as those words are used in sections 6 and 8, article XI. But to the question: Is the regulation of the establishment and operation of a passenger stage corporation, as defined in the Public Utilities Act, a municipal affair? the answer must be given that it is not. The latest expression on the subject that we have discovered is in the case of
 
 Morel
 
 v.
 
 Railroad Com.,
 
 (1938) 11 Cal. (2d) 488 [81 Pac. (2d) 144], where, at page 500, the Supreme Court made this statement': “ ... it is contended that the matter of regulating the uSe of the streets of a city for commercial purposes is a municipal matter and is not subject to the control of the legislature.”
 

 “Upon this question after reviewing the cases of
 
 Ex parte Daniels,
 
 183 Cal. 636 [192 Pac. 442, 21 A. L. R. 1172], and
 
 *Supp. 735
 

 In re Murphy,
 
 190 Cal. 286 [212 Pac. 30], this court held: ‘The effect of these decisions is to declare that whenever the state of California sees fit to adopt a general scheme for the regulation and control of motor vehicles upon the public highways of the state, the entire control over whatever phases of the subject are covered by state legislation ceases in so far as municipal or local legislation is concerned. ’
 
 (Atlas Mixed Mortar Co.
 
 v.
 
 City of Burbank,
 
 202 Cal. 660 [262 Pac. 334].)
 

 “It is true that these cases involve regulation of the
 
 use
 
 of city streets and the instant case relates to the regulation of a
 
 business
 
 transacted upon such streets, and it is contended for this reason that these cases are not authority in support of the right of the state to regulate business carried on on the streets of a city. But the transacting of business upon a street necessarily requires the use of the street for that purpose, and the use of the street for the purpose of transacting business thereon is as a rule a much more onerous and burdensome use than the mere traveling over said streets by an ordinary private conveyance. If the latter use is a matter of public concern, we think the former which imposes far greater burdens upon the streets is also a matter of public concern and therefore subject to regulation imposed by the state.”
 

 We see no useful purpose in any discussion of the question in view of the authorities answering it. In addition to those cited in the quotation see:
 
 Helmer
 
 v.
 
 Superior Court,
 
 (1920) 48 Cal. App. 140 [191 Pac. 1001];
 
 City of San Bernardino
 
 v.
 
 Railroad Com.,
 
 (1923) 190 Cal. 562, 566 [213 Pac. 980];
 
 Whyte
 
 v.
 
 City of Sacramento,
 
 (1924) 65 Cal. App. 534, 546 [224 Pac. 1008] ;
 
 Key System Transit Co.
 
 v.
 
 City of Oakland,
 
 (1932) 124 Cal. App. 733, 741 [13 Pac. (2d) 979].
 

 Beyond all other declarations that a city’s power of control over public utilities, respecting other than municipal affairs, is subject and not superior to the will of the state legislature, is the express statement concluding this quotation from section 23, article XII, of the state Constitution : “The railroad commission shall have and exercise such power and jurisdiction to supervise and regulate public utilities, in the state of California, and to fix the rates to be charged for commodities furnished, or services rendered by public utilities as shall be conferred upon it by
 
 *Supp. 736
 
 the legislature, and the right of the legislature to confer powers upon the railroad commission respecting public utilities is hereby declared to be plenary and to be unlimited by any provision of this Constitution.
 

 “Prom and after the passage by the legislature of laws conferring powers upon the railroad commission respecting public utilities, all powers respecting such public utilities vested in boards of supervisors, or municipal councils, or other governing bodies of the several counties, cities and counties, cities and towns, in this state, or in any commission created by law and existing at the time of the passage of such laws, shall cease so far as such powers shall conflict with the powers so conferred upon the railroad commission. ’ ’
 

 Were this all of the section we would consider our problem fully solved, for the city’s authority to pass an initiative ordinance is the same as the power of the city council to legislate. (Sec. 272, Los Angeles City Charter, and see
 
 Hurst
 
 v.
 
 City of Burlingame,
 
 (1929) 207 Cal. 134, 140 [277 Pac. 308].) As amended in 1911, however, section 23 contained a proviso, and since 1914 it contains two, which, the appellant claims, preserve inviolate the city’s power to pass and enforce the ordinance under consideration. The 1911 draft of the proviso, under consideration in some of the earlier cases, follows: “provided, however, that this section shall not affect such powers of control over any public utility vested in any city and county, or incorporated city or town as, at an election to be held pursuant to laws to be passed hereafter by the legislature, a majority of the qualified electors voting thereon of such city and county, or incorporated city or town, shall vote to retain, and until such election such powers shall continue unimpaired”. In 1914 this proviso was amended and another added to read as we now find them: “provided, however, that this section shall not affect such powers of control over public utilities as relate to the making and enforcement of local, police, sanitary and other regulations, other than the fixing of rates, vested in any city and county or incorporated city or town as, at an election to be held pursuant to law, a majority of the qualified electors of such city and county, or incorporated city or town, voting thereon, shall vote to retain, and until such election, such powers shall continue unimpaired; . . . and provided, further that this section shall not affect the right of any city and county or incor
 
 *Supp. 737
 
 porated city or town, to grant franchises for public utilities upon the terms and conditions and in the manner prescribed by law.”
 

 At this point, we find ourselves in agreement with the appellant in two of its positions. First, we agree that the power back of the initiative ordinance relates to the making and enforcing of “local, police, sanitary and other regulations”, respecting a public utility. We see no reason to give these words a meaning in section 23, article XII, more restricted than, or different from, that given them when they appear in identical sequence in section 11, article XI. Under their police power, which is what these words express, cities have the power to regulate passenger busses, operating as common carriers on their streets. If authority is necessary, we have it in
 
 Ex parte Cardinal,
 
 (1915) 170 Cal. 519 [150 Pac. 348, L. R. A. 1915F, 850], Furthermore, we concede that, in 1911 and in 1914, there was not any general law conflicting with the full exercise of this power; at that time the power to make and enforce such an ordinance as the one now relied upon existed unimpaired in the city of Los Angeles. In the premises, the appellant claims, the power to regulate busses was
 
 vested
 
 in the city when the amendment was adopted in 1914, and as the power has never been surrendered by a vote of the city, the power to enforce the initiative ordinance still exists. With this conclusion, however, we do not agree.
 

 The authorities make two approaches to the problem, both leading to the same answer. The earliest cases take the position that the powers that cities had in 1914 to regulate public utilities was vested in them, but that, except when relating to a municipal affair, this power which was vested retained its characteristic frailty; it wilted in the face of adverse legislative action. In
 
 Title Guaranty & Trust Co.
 
 v.
 
 Railroad Com.,
 
 (1914) 168 Cal. 295 [142 Pac. 878, Ann. Cas. 1916A, 738], it was held that the power of the city of the sixth class to regulate the rates, and to prescribe proper rules relating to the delivery of water, was vested in the city and was not divested by the purported grant of a like power to the railroad commission. A like conclusion was reached in
 
 City of Los Angeles
 
 v.
 
 Central Trust Co.,
 
 (1916) 173 Cal. 323 [159 Pac. 1169], respecting the en-'1 deavor of the city of Los Angeles to condemn a right of way
 
 *Supp. 738
 
 across an existing railroad in the absence of the approval of the railroad commission. It was held that the power to open streets in the city was a power respecting a municipal affair; that if the grant of power over the matter to the railroad commission were regarded as the exercise of the legislature’s general authority, it was subject to the city’s charter respecting municipal affairs; that if it were regarded as the exercise of the special authority granted by section 23, article XII, it was subject to the proviso respecting vested powers.
 

 In each of these cases the fact was pointed out that section 82 of the Public Utilities Act then in force (Stats. Extra Sess. 1911, p. 62) reenacted the proviso of section 23, article XII. But the Public Utility Act no longer contains this legislative declaration that its provisions are not to be exclusive, are not to occupy the whole field, and this is a vital omission, as was stressed in
 
 Civic Center Assn.
 
 v.
 
 Railroad Com.,
 
 (1917) 175 Cal. 441 [166 Pac. 351], The action in the Civic Center case was one to compel the railroad commission to order the three railroads entering the city of Los Angeles to abolish grade crossings and establish a common depot. Among other positions taken in opposition to such an order was the contention that the city had complete authority respecting its streets. Of particular interest to our problem are these conclusions: “It will be observed that the reservation in the proviso of section 23 to all cities of the powers theretofore vested in them is general, and embraces all powers of local police regulation over public utilities, except rate-fixing, then vested in such cities, including those relating • to matters of general concern as well as those relating to municipal affairs. From this it would follow that the powers of this character then vested in Los Angeles, by its charter, to regulate and control the state railroads in their operations and street crossings within the city, would also be reserved to the city and would remain unimpaired. Such power appears to have been vested in the city in October, 1911, by section 34 of its charter, above mentioned, and by subdivisions 30 and 38 of section 2 of its charter as amended on March 25, 1911. (Stats. 1911, pp. 2063, 2065.) (Section 15 of the act of February 9, 1911, so far as it relates to crossings of ‘public roads and highways’, was, in our opinion, intended to apply only to crossings outside of cities, and it did not operate to divest
 
 *Supp. 739
 
 Los Angeles of such powers within that city.) But notwithstanding this comprehensive effect of the proviso, if taken alone and literally, we think that when considered in connection with the language of section 6 of article XI, defining the tenure upon which cities hold powers over matters not municipal in character, a clear distinction appears by virtue of which such powers may be divested by a general law. By the terms of section 6, article XI, powers vested in a city by a freeholders’ charter, to regulate affairs not municipal in character, were not absolute, but were ‘subject to and controlled by general laws’. Such powers, therefore, are granted upon the condition and subject to the qualification that they must yield to and be suspended by a general law inconsistent therewith, whenever such general law shall be enacted. The city holds its powers of this character subject to this condition. Such power would, therefore, be divésted by the happening of the condition. So far as a power of this character is reserved to the city by the proviso of section 23, it is reserved with the conditions upon which it was granted inhering in it. The reservation was not intended to destroy or annul the terms of the grant by which such power became vested in the city, or remove the condition subsequent, but only to hold it as it was and leave the power, as before, subject to suspension upon the passage of a general law inconsistent therewith. . . . The Public Utilities Act of 1915 omits this reservation. Consequently, with respect to affairs not municipal, upon the rule just stated, it supersedes all grants of power by the city charter which are inconsistent with the act.”
 

 The second, and present day, avenue of approach to the answer to the appellant’s claim is that only those powers are “vested” in a chartered city, as that word is used in section 23, article XII, that relate to municipal affairs; all other powers, being subject to legislative change, cannot be said to be vested. In
 
 City of San Mateo
 
 v.
 
 Railroad Com.,
 
 (1937) 9 Cal. (2d) 1 [68 Pac. (2d) 713], the matter is considered at some length and this statement made (p. 7): “The term ‘vested’ found in the proviso as originally adopted in 1911 must be deemed to refer to ‘such powers of control over’ public utilities as were then lodged in municipalities and such as were beyond the power of the legislature to withdraw without the cities’ consent. Whatever vested power the municipalities of the state enjoy they
 
 *Supp. 740
 
 derive from the state Constitution and to the extent there permitted. And the only municipalities in the state vested with immunity from control of the legislature are freeholders’ charter cities organized under section 8 of article XI of the Constitution. The immunity from legislative control is limited to municipal affairs and to the extent specified by sections 6 and 11 of the same article. With respect to other matters charter cities are subject to and controlled by general laws. Municipalities organized under the general Municipal Corporations Act possess no powers which are not subject to and controlled by general laws, and do not enjoy ‘vested’ powers within the meaning of the proviso of section 23 as originally adopted in 1911. The same conclusion must be drawn as to the effect of the amendment of the proviso in 1914.” By way of a summary our Supreme Court continued (p. 8) : ‘‘From the history of the proviso in question and its relation to other provisions of the Constitution, it must be concluded that the term ‘vested’ as used in the proviso, referred to powers of control over public utilities (1) such as related to the making and enforcement of local, police, sanitary and other regulations in chartered cities (other than the fixing of rates); (2) such as related to municipal affairs; and (3) such as had been assumed by such cities by appropriate charter provision. This was the holding, and properly so, in
 
 Mountain View
 
 v.
 
 Southern Pac. R. R. Co.,
 
 (1934) 1 Cal. App. (2d) 317 [36 Pac. (2d) 650].”
 

 Because, as we have already discovered, the city’s initiative ordinance deals with a question which is not a municipal affair, one concerning which its charter does not give it supreme control, the ordinance is not protected against a conflicting grant of power to the railroad commission by the first proviso of section 23, article XII. Does the second of the two provisos, quoted, the one preserving the city’s right ‘‘to grant franchises for public utilities upon the terms and conditions and in the manner prescribed by law”, keep the ordinance enforceable? It is our conclusion that it does not.
 

 The appellant’s argument is based on the provisions found in paragraph (a), subsection (8), section 3, of the Los Angeles City Charter, reading: ‘‘The city may grant franchises for fixed terms, permits or privileges, for the construction and operation of plants or works necessary or convenient for
 
 *Supp. 741
 
 furnishing the city and its inhabitants with transportation . . . and may prescribe by ordinance, approved by a vote of the people, the method of procedure for making such grants, subject to the limitations elsewhere contained in this charter.’’ The terms “franchises” and “permits” are here used interchangeably, the argument proceeds, and the “franchises” of the proviso of section 23, article XII, include “permits”. Not expressly presented but implicit in the appellant’s argument is the further proposition that the right to grant a franchise or permit, saved by the proviso, includes the right to deny one. Hence, the city of Los Angeles can punish the defendant for using its streets without the permit required by the initiative ordinance (No. 58198).
 

 If the appellant’s argument is good, then this last proviso of section 23, article XII, affords a simple device to each city of the state, chartered or not, whereby it may recapture control over all public utilities operating within its confines. All a city need do is to adopt an ordinance forbidding a public utility to operate without a permit. Then, as the necessity for a permit is the necessity for a franchise, the city is in control. Such a conclusion is so startling as to create a grave doubt of its correctness.
 

 One fault with the processes by which the conclusion is reached is the assumption that the “permit” required by the ordinance belongs to the class of permits that are synonymous with franchises. Obviously, this is not so. “Franchises are special privileges conferred by the government upon individuals and which do not belong to the citizens of the country generally, of common right, ’ ’ a quotation from 26 C. J. 1008, found in
 
 Roth Drug, Inc.,
 
 v.
 
 Johnson,
 
 (1936) 13 Cal. App. (2d) 720, 738 [57 Pac. (2d) 1022]. If a franchise may be required, therefore, before one may operate a passenger bus line within a city (and that it may not be is held in
 
 Northeast Rapid Transit Co.
 
 v.
 
 City of Phoenix,
 
 (1932) 41 Ariz. 71 [15 Pac. (2d) 951]), it is because one does not have that right at common law without a “permit”, not because some ordinance says one must have a permit.
 

 That the “permit” of the initiative ordinance heretofore mentioned is not the “permit” which is a “franchise” within the meaning of section 3 (8) (a) of the charter, is further clearly seen when we note that the ordinance does
 
 *Supp. 742
 
 not pretend to grant its permit “upon the terms and conditions and in the manner prescribed by law” for the grant of a franchise. As authorized by the pertinent charter section (section 3 [8] [a]) the city has duly adopted two ordinances, the first, ordinance No. 27557 (N. S.), then, shortly after the adoption of the initiative ordinance (No. 59198), ordinance No. 58200 to take the place of ordinance No. 27557 (N. S.). In each of these ordinances (as in the Broughton Act [Stats. 1905, p. 777, Act 2720, Deering’s Gen. Laws 1937]) provision is made that the franchise to be granted shall be sold to the highest bidder. The charter itself prescribes many terms which must be inserted in each franchise or permit granted, as, to take one example, that the city reserves the right to purchase the property of the utility. The permit of the initiative ordinance has no such term. For aught that appears in this criminal proceeding, the defendant’s employer, Bay Cities Transit Company, may have a franchise to operate; if the city has a right to demand such a franchise, it has not exercised that right in the initiative ordinance on which this prosecution is based.
 

 For the reasons given, we conclude that the order dismissing the complaint was proper; it is affirmed.
 

 Shaw, P. J., concurred.