[Civ. No. 5262.  Fourth Dist.  May 11, 1956.]

DESERT TURF CLUB (a Corporation), Appellant, v. THE
  BOARD OF SUPERVISORS OF RIVERSIDE
  COUNTY et al., Respondents.

Thompson & Colegate and John E. Glover for Appellant.

Ray T. Sullivan, Jr., County Counsel, Leo A. Deegan, Deputy County Counsel, and James H. Angell, Assistant County Counsel, for Respondents.

CONLEY, J. pro tem.*—This case involves the proper definition and delimitation of authority as between the state and the county of Riverside in their respective control and administration of horse racing and zoning.

The appellant, Desert Turf Club, a corporation, after securing a permit from the California Horse Racing Board to conduct quarter-horse racing at the site hereafter described, made written application to the Riverside County Planning Commission for a land use permit to establish, operate and maintain a race track on Zone M-3 land in the Northwest Quarter and the North Half of the Southwest Quarter of Section 6, Township 5 South, Range 6 East, S.B. B. & M., comprising 240 acres, situated on the east side of Del Sol Road, between Tamarisk Road and Avenue 40. The California Horse Racing Board by a decision and order of July 19, 1954, had determined:

---

*Assigned by Chairman of Judicial Council.

"1. That the applicant, Desert Turf Club, has shown and established that the conducting of quarter-horse racing meetings of the proposed Palm Springs track would be in the public interest and would subserve the purposes of the California Horse Racing Act;

"2. That the conducting of quarter-horse racing meetings at the proposed Palm Springs track will be in the public interest and will subserve the purpose of the California Horse Racing Act."

After a public hearing pursuant to proper notice, the Riverside Planning Commission made its order and decision on February 23, 1955, recommending to the board of supervisors that the application be granted upon certain specified terms and conditions, all of which were afterwards accepted and agreed to by the applicant. In accordance with the requirements of article III of Ordinance 348 of Riverside County, the planning commission filed with the board of supervisors on March 2, 1955, in connection with its recommendation that the application be granted, a summary of the testimony presented at the public hearing and all reports and exhibits which had been introduced in evidence. Thereafter, the board of supervisors regularly noticed and held a public hearing on the question on March 28, 1955; besides the entire files and records of the planning commission on its hearing, the board received evidence from several witnesses respectively for and against the granting of the permit and also accepted as evidence various petitions and letters in opposition thereto. At the close of the hearing, the board, by unanimous vote, denied the application for the permit.

No findings of fact of any kind were made by the supervisors, but the record of the proceedings makes it abundantly clear that the board members took into consideration "every type of evidence that anybody cared to bring to us" and that they assumed that it was "up to the Board to look at all angles, the moral aspects or any other point."

On April 22, 1955, Desert Turf Club filed its petition for a writ of mandate praying that the board of supervisors be required to cancel its order denying the permit, and to make an order granting it and further praying that Charles Bixel, as Chief Building Inspector of Riverside County be required to issue the permit. The respondents below filed a general and special demurrer; at the hearing, which according to the reporter's transcript was held "Before Hon. R. Bruce Findlay, Superior Court Judge (of San Bernardino County),

presiding as Superior Court Judge of Riverside County but actually sitting in San Bernardino County, California, May 24 and 25, 1955,'' it was stipulated that the special demurrer be deemed withdrawn, and that if the general demurrer should be overruled the cause would be submitted for decision substantially on the record of the hearing before the board of supervisors. The court overruled the general demurrer, denied the peremptory writ of mandate and discharged the alternative writ.

The trial court determined in its conclusions of law that the order of the board of supervisors denying the application for a permit was sufficiently supported by competent substantial evidence, that the board did not act arbitrarily, capriciously or unlawfully, and/ that petitioner was not denied a fair trial and

''5. That, although the licensing throughout the State of California of horse racing tracks where pari-mutuel wagering is conducted is a matter of general and statewide concern, the same is, nevertheless, a municipal affair and is subject to local regulation as embodied by the provisions of Ordinance 348 of the County of Riverside, Section 3.1 of Article III thereof.''

It is our opinion that the trial court erred in these views.

By the provisions of section 65300 of the Government Code each county in the state is required to create a planning commission; each of said latter bodies is directed to adopt a comprehensive long-term master plan for the development of the county (Gov. Code, § 65460). Zoning regulations by boards of supervisors are specifically authorized by law, it being provided that a county may by ordinance ''regulate the use of buildings, structures, and land as between agriculture, industry, business, residence and other purposes.'' (Gov. Code, § 65800.) The Riverside County Zoning Ordinance Number 348, is a part of the master plan of land used in Riverside County, it having been adopted as recited in article I thereof ''in order to classify, restrict, regulate and encourage the orderly use of land in the County of Riverside and to conserve and promote public health, peace, safety, comfort, convenience, and general welfare.'' Article III of the zoning ordinance provides that:

''All the unincorporated territory of the County which is not included under the terms of this ordinance in any other zone is hereby designated and classified as M-3 Zone.

"The restrictions pertaining to other zone classifications shall not be deemed or construed to apply to land or property in Zone M-3. The restrictions applicable to land use in M-3 Zone shall be only as hereinafter in this Article specifically set forth."

Article III, section 3.1 forbids a person to use any premises or erect any building in Zone M-3 for any of some 39 uses without first securing a permit; among these enumerated uses is "23. Race track, except for contests between human beings only."

By the adoption of section 25a of article IV of the Constitution, the people of the State of California enacted the controlling principle that the Legislature could provide for the regulation of horse races and horse race meetings throughout the state and wagering on the results thereof. ■ As is said in *Sandstrom* v. *California Horse Racing Board*, 31 Cal. 2d 401, 407 [189 P.2d 17, 3 A.L.R.2d 90] :

"When the state sees fit to regulate upon a matter which is within its police power, its authority over the subject is plenary. . . ."

Chapter 4 of division 8 (§§ 19400 to 19663) of the Business and Professions Code contains a full and comprehensive legislative treatment of legalized horse racing in this state which is a clear and complete plan for the state-wide control of the subject matter. Section 19480.5 of the Business and Professions Code provides that the board shall not issue any new license unless it shall determine that conducting horse racing meetings at such place will be in the public interest and will subserve the purposes of the provisions of state law relative to horse racing.

■ There can be no legitimate doubt that the state has taken over in its entirety the whole subject of horse racing. There is also no room for doubt that many thousands of citizens (who were in a minority at the time the constitutional amendment was adopted) are uncompromisingly opposed to race tracks and any form of betting on horses, not only on abstract moral grounds, but because of their observations as to the practical effect on the community. They oppose, so they say, any improvement in the breed of horses that debases the breed of men.

It is not our province to pass on the moral question but only on the question of power. ■ The query to be answered is : can a board of supervisors overrule the act of the people of the state in adopting a constitutional amendment

and the Legislature of the state in passing a full and comprehensive plan for the licensing and control of horse racing by forbidding on moral grounds what the state expressly permits? There is no escape, in our opinion, from a negative answer.

In *Shean* v. *Edmonds*, 89 Cal.App.2d 315, 325 [200 P.2d 879], it is said:

"Horse racing was recognized in this state in 1933 (Stats. 1933, p. 2046.) Section 25a of article IV of the Constitution gave certain powers regulating horse racing to the Legislature. 'The continuance of the grant of power' as expressed in certain sections of the Business and Professions Code 'did not affect its status as previously ratified and confirmed.' (*Sandstrom* v. *California Horse Racing Board*, 31 Cal.2d 401, 413 [189 P.2d 17, 3 A.L.R.2d 90].)

The opinion in *Cunningham* v. *Hart*, 80 Cal.App.2d 902, 906 [183 P.2d 75], thus enumerates various instances in which the adoption by the state of general laws covering the field deprives a local legislative body of any right to act relative to the subject matter involved:

"The following cases are examples of matters which have been determined to be of state-wide concern and in which general laws have prevailed over conflicting laws in municipalities adopting the 'home rule' afforded by section 6, article XI of the Constitution: *Ex parte Daniels*, 183 Cal. 636 [192 P. 442, 21 A.L.R. 1172], regulation of traffic on city streets. To the same effect, *Atlas Mixed Mortar Co.* v. *City of Burbank*, 202 Cal. 660 [262 P. 334]; *Mann* v. *Scott*, 180 Cal. 550 [182 P. 281]; *In re Murphy*, 190 Cal. 286 [212 P. 30]; *Pipoly* v. *Benson*, 20 Cal.2d 366 [125 P.2d 482, 147 A.L.R. 515]. Regulation of the character and standards of taxicab service to be performed on city streets, *In re Martinez*, 56 Cal.App.2d 473 [132 P.2d 901]. Appointment of a probation officer and the fixing of his salary payable out of the city and county treasury, pursuant to the Juvenile Court Law, *Nicholl* v. *Koster*, 157 Cal. 416 [108 P. 302]. Sustaining the Metropolitan Water District Act which permits individual municipalities to initiate proceedings in the formation of a water district, *City of Pasadena* v. *Chamberlain*, 204 Cal. 653 [269 P. 630]. Sustaining the City Boundary Line Act, *Gadd* v. *McGuire*, 69 Cal. App. 347 [231 P. 754]. Adoption of a pension system by a municipality does not take the place of the Workmen's Compensation Law in its application to city employees, *Sacramento* v. *Industrial Acc. Com.*, 74 Cal.App. 386 [240 P. 792]. General

laws prohibiting the licensing by a city of a house of prostitution, *Farmer* v. *Behmer,* 9 Cal.App. 773 [100 P. 901]. General laws prohibiting the organization and control of a school district by a county, *Scott* v. *County of San Mateo,* 27 Cal.App. 708 [151 P. 33]. A statute claiming a city street to be a secondary state highway prevails over right of municipality to improve that street, *Southern California Roads Co.* v. *McGuire,* 2 Cal.2d 115 [39 P.2d 412]. Exclusive control in the state of liquor licensing, *Los Angeles Brewing Co.* v. *[City of] Los Angeles,* 8 Cal.App.2d 391 [48 P.2d 71]. Issuance and revocation of motor bus licenses within a city, *People* v. *Willert,* 37 Cal.App.2d Supp. 729 [93 P.2d 872]. Drunken driving provision in Motor Vehicle Act prevails over city ordinance, *Helmer* v. *Superior Court,* 48 Cal.App. 140 [191 P. 1001]. Liability of a municipality for tortious acts or omissions of its servants, *Douglass* v. *City of Los Angeles,* 5 Cal.2d 123 [53 P.2d 353]. Liability of a municipality for defective highways within its limits, *Wilkes* v. *City etc. of San Francisco,* 44 Cal.App.2d 393 [112 P.2d 759].''

This rule has also been applied by this court to a city ordinance requiring an electrical contractor, licensed by the state, to procure a local business license (*Horwith* v. *City of Fresno,* 74 Cal.App.2d 443 [168 P.2d 767]). (See *Agnew* v. *City of Los Angeles,* 110 Cal.App.2d 612 [243 P.2d 73].) And this court has pointed out that this principle gives the State of California the sole right to regulate and license the liquor business. (*City of San Diego* v. *State Board of Equalization,* 82 Cal.App.2d 453, 464 [186 P.2d 166].)

What does this holding do to the zoning ordinance? Nothing at all. The right to zone is by express provision of law a local matter. ██ A board of supervisors, acting of course in good faith, may by properly adopting zoning restrictions exclude on soundly-based grounds the installation of a horse racing track or any other type of activity from those portions of the county as to which such exclusion is reasonable, just as manufacturing establishments or business houses may be legitimately prohibited in residential districts. ██ But the board cannot under guise of doing one thing, accomplish a wholly disparate end. The board here, on moral grounds, contrary to the legislative fiat of the people, has in effect excluded all horse racing from all parts of the county—or, to borrow an analogy from the field of liquor regulation, has exercised a *local option* with respect to horse racing. There

is no such thing as local option on this question under the present law.

If the opinion evidence of those persons opposed to the granting of the permit on the ground that horse racing and its attendant betting are immoral be eliminated, there is insufficient evidence in the present record to uphold the decision of the board of supervisors, or the findings of the trial court. The testimony adduced on behalf of petitioner was: that the plans and specifications for the construction of the track and buildings in all respects conformed with state and county building codes and regulations; that access roads for ingress and egress were adequate to handle traffic; that the use and development of the land as proposed conformed with good and established planning and zoning regulations; that there would be no flood problem or water drainage problem; that the owners of all property within a distance of 500 feet from the exterior boundaries of the premises favored the granting of the application; that the nearest subdivided area is approximately one-half mile from the site; that government land and vineyards adjoin the proposed track; that no objections of any kind have been interposed by the Riverside County Flood Control and Water Conservation District or the Riverside County Agricultural Commissioner.

The opposing evidence of a number of citizens was that the nature of the general area as one of homes and farms would be violated by the building of a race track; that police problems, in the opinion of the witness based on hearsay, would be increased by the attraction to the course of undesirable types; that many petitioners opposed the coming of a race track believing that "gambling is a social evil." The Coachella Valley Ministerial Association filed a protest containing numerous names of citizens who opposed "the establishment of any race track where parimutuel betting is permitted"; attached to the signed document is a writing signed by Harvey W. Harper, Chairman, stating as further grounds of opposition ". . . it would not be within the public interest to bring such a questionable industry into this area" and asserting that it would be an economic burden, in that money would be taken away from the community by parimutuel betting, law enforcement problems would arise, county roads would be overtaxed and fire protection problems would arise; further it was said that ". . . It has been clearly demonstrated in other cases that credit ratings drop during racing seasons"; next the document states that a race track would

be a social and cultural detriment through the attraction of ''undesirable elements'' and finally that the moral tone of the community would be lowered.

Supervisor Varner made the following observation at the close of the hearing:

''Out of 100 telephone calls received approximately ninety were in opposition to granting permission for the race track. I have received here and admitted in evidence some 20 letters, almost all—there were two in favor of it. There have been petitions submitted here today of between some four and five hundred names in opposition to granting this permit. In view of this fact it indicates to me that it is not in the public interest to grant this M-3 Permit to establish this quarter-horse race track. I move that the M-3 Permit be denied.''

The motion having been seconded, all supervisors voted ''Aye'' and the permit was denied.

Some of the reasons advanced by the witnesses opposing the granting of the permit should weigh powerfully with the voters of California in determining whether race tracks and parimutuel betting should be allowed anywhere, but in view of the preemption by the state of the whole field of legislation and the passage of complete general laws on the subject such arguments are not available in the present situation. Counsel for respondents ably attempt a scholastic distinction between the abstract immorality of race tracks and parimutuel gambling which they concede is not available to respondents because the state has taken over that total legislative field, and the alleged objective social demoralization resulting from racing and gambling, which, they argue, may still be considered by the board of supervisors in judging whether a permit should be issued under the zoning ordinance. But, to use an old western expression, the hair goes with the hide. Those who believe strongly that gambling is immoral base their opinion largely, if not wholly, on its observed effect on people and the community. Similarly, the opposition to alcoholic drinks does not arise from any abstract hatred for alcohol as such, but from a dislike for what it does to drinkers, as individuals and social groups. The onus of the people's authorization of race tracks and parimutuel machines must be borne by the grouped voters of the whole state; they have, for the time being at least, decided the question, and whatever advantages or disadvantages go with the decision cannot be barred by local legislative action from the entire territory of any county, as has been done in this case.

Appellants also complain concerning the nature of the evidence accepted by the board of supervisors at the hearing. ██ While administrative bodies are not expected to observe meticulously all of the rules of evidence applicable to a court trial, common sense and fair play dictate certain basic requirements for the conduct of any hearing at which facts are to be determined. Among these are the following: the evidence must be produced at the hearing by witnesses personally present, or by authenticated documents, maps or photographs; ordinarily, hearsay evidence standing alone can have no weight (*Walker* v. *City of San Gabriel*, 20 Cal.2d 879, 881 [129 P.2d 349, 142 A.L.R. 1383]; *Englebretson* v. *Industrial Acc. Com.*, 170 Cal. 793, 797 [151 P. 421]; *Employers A. Corp.* v. *Industrial Acc. Com.*, 170 Cal. 800, 801 [151 P. 423]; *Dyment* v. *Board of Medical Examiners*, 93 Cal.App. 65 [268 P. 1073]; *Thrasher* v. *Board of Medical Examiners*, 44 Cal.App. 26 [185 P. 1006]), and this would apply to hearsay evidence concerning someone else's opinion; furthermore, cross-examination within reasonable limits must be allowed. Telephone calls to one of the officials sitting in the case, statements made in letters and arguments made in petitions should not be considered as evidence.

██ As it appears to us that the board of supervisors based its action on an erroneous conclusion as to its legal rights and duties, and that upon the record legitimately before it the board acted in abuse of its discretion, a writ of mandate should issue. (*Tilden* v. *Blood*, 14 Cal.App.2d 407, 413-414 [58 P.2d 381]; *Martin* v. *Board of Supervisors*, 135 Cal.App. 96, 103 [26 P.2d 843]; *Walker* v. *City of San Gabriel, supra,* 20 Cal. 2d 879; *Bleuel* v. *City of Oakland*, 87 Cal.App. 594, 597-598 [262 P. 477].)

But, as the board of supervisors has a proper field for the operation of its discretion in the enforcement of its zoning ordinance, after eliminating the moral ground of opposition to racing, this court cannot agree with the contentions of the appellant that the board of supervisors is wholly without jurisdiction to pass on the application, and that the permit of the State Racing Board is all that is required. (*Dormax Oil Co.* v. *Bush,* 42 Cal.App.2d 243 [108 P.2d 710].) The same observation applies to the contention that the board should be by-passed and a writ directed to the respondent building inspector, requiring him to issue a permit forthwith. The writ should be directed to the board of supervisors and its members requiring them to cancel and annul the order denying

appellant's application, and to reopen the hearing with leave to hold a supplemental hearing upon due notice if they be so advised, and to reconsider the petition of appellants as to land use, wholly excluding any consideration as to the alleged immorality of horse racing and betting as authorized by state law, and wholly excluding from such consideration all testimony not received in open hearing, and all statements of alleged fact and arguments in petitions and letters on file, except the bare fact that the petitioners or letter writers approve or oppose the granting of the petition; also wholly excluding each and every instance of hearsay testimony unless supported by properly admissible testimony, it being further required that the attorneys representing any party in interest be granted a reasonable opportunity to examine or cross-examine every new witness produced.

Attention has already been called to the statement in the reporter's transcript that the case was tried before a superior court judge of San Bernardino County, "presiding as Superior Court Judge of Riverside County but actually sitting in San Bernardino County." The first page of the transcript begins:

"San Bernardino, California, May 24, 1955,

Afternoon Session

"MR. DEEGAN: Your Honor, for the purpose of this case you are sitting as Superior Court Judge of Riverside County?

"THE COURT: Yes, I appreciate you gentlemen coming over here, otherwise we would be in the position of having to exchange judges, get started on a case here, never could seem to finish up at the same time."

We assume from the foregoing that the judge who tried the case had secured the essential assignment from the Chairman of the Judicial Council to sit and act in Riverside County, but that for convenience the case was actually tried in the San Bernardino County courthouse, with the tacit or express consent of the attorneys. Appellant does not raise any point as to jurisdiction or error in this respect. But this court cannot let pass unnoticed the impropriety involved in this irregular procedure. ■ The sessions of the superior court of a given county, under the law, must be held in that county (Gov. Code, §§ 69741, 68099; 13 Cal.Jur.2d, "Courts," § 41).

The judgment is reversed, with instructions upon the going down of the remittitur to amend the findings of fact and con-

clusions of law in accordance with the views expressed in this opinion, and to enter a judgment granting a peremptory writ of mandate directed to the board of supervisors of Riverside County and the members thereof requiring them forthwith to cancel and annul their order denying appellant's petition and to proceed without delay to carry on and complete a hearing in the manner indicated and set forth in this opinion.

Barnard, P. J., and Griffin, J., concurred.