[No. 28858. Department One. October 1, 1942.]

AMERICAN SMELTING & REFINING COMPANY, *Respondent*, v. TACOMA SCHOOL DISTRICT No. 10 *et al.*, *Appellants*, PIERCE COUNTY, *Defendants*.[1]

¹Reported in 129 P. (2d) 531.

*Leo Teats* and *Ralph Teats,* for appellant Tacoma school district No. 10.

*Howard Carothers* and *Clarence M. Boyle,* for appellant city of Tacoma.

*Hugo Metzler* and *Burkey & Burkey,* for respondent.

STEINERT, J.—Plaintiff instituted a taxpayer's action against a group of defendants including a school district and its directors, the city of Tacoma together with its mayor and commissioners, and Pierce county conjunctively with its commissioners and assessor, and sought thereby to obtain: (1) a judgment declaring that two certain tax propositions, theretofore submitted to the electorates of the city and school district, respectively, at a combined election, had failed to receive the vote necessary to their adoption; (2) a decree nullifying a resolution and an ordinance which the school directors and the city commissioners, respectively, had passed with the view of authorizing the levy of special taxes as prescribed in the submitted propositions, notwithstanding the fact, as claimed by plaintiff, that such propositions had not received the requisite vote at the particular election; and (3) an injunction permanently restraining and prohibiting all of the defendants from proceeding with, or taking any steps with reference to, the levy or assessment of any special tax pursuant to the propositions claimed by plaintiff to have been defeated. Defendants answered, admitting the material allegations of fact contained in the complaint.

When the case came on for trial, the school district interposed a motion for judgment on the pleadings. The city joined in the motion, and thereupon the court, with the consent of all the parties, considered the motion as though interposed by each of them.  After taking the matter under advisement, the court denied the motion in so far as the defendants were concerned and then made findings and conclusions upon which it granted judgment in favor of plaintiff according to the prayer of its complaint.  The defendants Tacoma school district No. 10 and the city of Tacoma alone have appealed.

The problem presented for determination upon the appeal is whether, at the election referred to above, the two special tax propositions in question received the vote necessary for their adoption.  The solution of that problem depends upon the interpretation to be given to certain provisions contained in the forty mill tax limitation act (initiative measure number 129; Laws of 1939, chapter 2, p. 5; Rem. Rev. Stat. (Sup.), § 11238-1c [P. C. § 6882-77d]), and also in the forty mill tax referendum act (referendum measure number 5; Laws of 1939, chapter 83, p. 217, Laws of 1941, p. 966; Rem. Rev. Stat. (Sup.), § 11238-1d), to which we shall make full reference later.

On March 10, 1942, appellants, Tacoma school district No. 10 and the city of Tacoma, together with Metropolitan Park Board, joined in holding their general municipal elections, at which certain officers for the respective municipalities were to be elected from a list of designated candidates.  With the exception of a few precincts in the school district lying outside the city of Tacoma, the boundaries of the three municipal corporations are coextensive.

At the same time, and in conjunction with the general elections, the school district and the city each sub-

mitted a special tax proposition to be voted upon by their respective electorates. The proposition submitted by the school district was for authorization to levy an extra tax of three and one-half mills for the maintenance and operation of schools in 1942-1943. The proposition submitted by the city was for authorization to levy a special two mill tax in 1942 for civilian defense and war emergency needs.

In the conduct of the several combined elections, voting machines were used throughout the respective taxing districts, and the form of the ballot label was so arranged that at the top thereof, opposite a design bearing the inscription "SPECIAL ELECTION," appeared the two special tax propositions; and upon the lower portion of the ballot label appeared a list of the various municipal offices to be filled, the names of the respective candidates, and directions as to the number to be elected to each office.

After the election, and pursuant to law, the Pierce county election board canvassed the votes and issued its certificates of election. The certificates respectively recited that a total of 31,969 persons had voted in the school district election and a total of 31,464 had voted in the city election. The certificates then set forth the number of votes received by each of the candidates for the various municipal offices, but with these we are not now concerned, since no question is here raised as to the validity of the general election of officers.

The certificates next recited that, with respect to the special tax proposition submitted by the school district, 12,862 votes had been cast in favor thereof and 6,100 votes against it, making a total of 18,962 votes upon that measure; and that, with respect to the special tax proposition submitted by the city, 12,476 votes had been cast in the affirmative and 5,543 votes in the nega-

tive, making a total of 18,019 votes on that question. Proceeding further, the certificates recited that "the total number of votes at the last gubernatorial election within the city of Tacoma was 51,057, forty per cent of which would be 20,423." As will presently appear, the figures shown by this last recitation, as compared with the total number of votes cast on the respective special tax propositions, furnish the material upon which the dispute in this action is grounded.

As already indicated, the submission of the two special tax propositions contemplated the creation of municipal debts, to be met by the levy of special taxes. Art. VIII, § 6, of the Washington constitution imposes certain limitations upon municipal indebtedness and specifies the purposes for which such indebtedness may be incurred. It declares, among other things, that no city or school district shall for any purpose become indebted in any manner to an amount exceeding one and one-half per centum of the taxable property in such city or school district without the assent of three-fifths of the voters therein voting at an election *to be held for that purpose.*

In conformity to the constitutional limitations, the forty mill tax limitation act and the forty mill tax referendum act, referred to above, each provides, in part, as follows:

"That any county, school district, city or town shall have the power to levy taxes at a rate in excess of the rate specified in this act, when authorized so to do by the electors of such county, school district, city or town by a three-fifths majority of those voting on the proposition *at a special election,* to be held in the year in which the levy is made, and not oftener than once in such year, in the manner provided by law for holding general elections, at such time as may be fixed by the body authorized to call the same, . . . at which *special election* the proposition of authorizing such ex-

cess levy shall be submitted in such form as to enable the voters favoring the proposition to vote 'Yes,' and those opposed thereto to vote 'No': *Provided,* That the total number of persons *voting at such special election* shall constitute forty per cent of the voters in said taxing district who voted for the office of governor at the next preceding gubernatorial election." (Italics ours.) Rem. Rev. Stat. (Sup.), § 11238-1c [P. C. § 6882-77d]; Rem. Rev. Stat. (Sup.), § 11238-1d.

The combined elections held on March 2, 1942, constituted a *general* election by each of the three municipalities named above, in so far as the election of officers was involved, and a *special* election by each of the appellant municipalities in so far as it related to the respective special tax propositions submitted at that time. In *Fox v. Seattle,* 43 Wash. 74, 86 Pac. 379, 117 Am. St. 1037, wherein was presented a question very similar to the one here involved, this court said:

"It will be observed that the constitution [Art. VIII, § 6] requires propositions of this kind to be submitted to a vote at an election *to be held for that purpose.* This is, in effect, providing a special election for the submission of questions of this kind, and if all the requirements of a special election are met, as we understand they were met in this case, by giving proper notice, etc., the fact that for the sake of economy the election was held on the same day that a general city election was held, and that the same ballots were used, does not make it a general election, or take it out of the provision of the constitution above quoted, viz., that such proposition must be submitted at an election *to be held for that purpose;* but that the election on the special proposition being so held is merely an incident not affecting in any manner its distinct purpose or character. The constitution, it will be noted, does not provide for either general or special elections so termed, but provides only for an election to be held for that purpose, and that purpose, of course, is a special purpose."

Other cases illustrative of special elections are: *State ex rel. Ferguson v. Superior Court,* 140 Wash. 636, 250 Pac. 66; *State ex rel. Rummens v. Superior Court,* 160 Wash. 520, 295 Pac. 730; *State ex rel. Dore v. Superior Court,* 171 Wash. 423, 18 P. (2d) 51; *Robb v. Tacoma,* 175 Wash. 580, 28 P. (2d) 327, 91 A. L. R. 1010.

The holding of this court, in the *Fox* case, *supra,* with reference to the distinctive character of special elections, though held in conjunction with general elections, is supported by the general weight of authority. *Howland v. Board of Supervisors of San Joaquin County,* 109 Cal. 152, 41 Pac. 864; *Morgan v. Los Angeles,* 182 Cal. 301, 187 Pac. 1050; *People v. Buesinger,* 324 Ill. 534, 155 N. E. 473; *People v. Rogier,* 326 Ill. 310, 157 N. E. 177; *Eberhardt Construction Co. v. Sedgwick County,* 100 Kan. 394, 164 Pac. 281; *Houston v. Boltz,* 169 Ky. 640, 185 S. W. 76; *State v. Blaisdell,* 18 N. D. 31, 119 N. W. 360; *Norton v. Coos County,* 113 Ore. 618, 233 Pac. 864; *Hill v. Hartzell,* 121 Ore. 4, 252 Pac. 552; *Munce v. O'Hara,* 340 Pa. 209, 16 A. (2d) 532, 131 A. L. R. 1379; *Davis v. Brown,* 46 W. Va. 716, 34 S. E. 839; 29 C. J. S. 14, Elections, § 1c; note (1941) 131 A. L. R. 1382, 1404(f).

In the case at bar, we have not only the mandate of the constitutional provision referred to above, but also that of the two legislative acts previously mentioned, which expressly require that such tax propositions be voted upon at "a special election." At this point it may be observed, parenthetically, that if the submission of, and the voting upon, the special tax propositions did not constitute a special election, then appellants have not complied with the fundamental provision of these statutes requiring that such matters be voted on at a *special election.*

Since, as we now hold, this was a special elec-

tion in so far as the submitted propositions were concerned, and since the appellants thereby sought authority to levy taxes in excess of the otherwise permissible rate, the provisions of Rem. Rev. Stat. (Sup.), §§ 11238-1c and 11238-1d, quoted above, were applicable and controlling. To comply with the requirements of these statutes it is necessary (1) that the authority to levy such excess taxes receive the sanction of a three-fifths majority of those *voting on the proposition* at the special election, and (2) that the total number of persons voting at such special election constitute forty per cent of the voters in the particular taxing district who voted for the office of governor at the next preceding gubernatorial election.

As shown above, 18,962 votes were cast in the school district special election, of which 12,862 were in favor of the proposition submitted by that municipality, and 18,019 votes were cast in the city special election, of which 12,476 favored the proposition submitted by the city. It is thus apparent that both propositions received the necessary three-fifths majority "of those voting" thereon. Hence, the first requirement of the statutes above quoted was met, and respondent does not now contend to the contrary.

The second requirement of the statute, however, presents the crucial question here involved. As shown by the respective certificates of election, 31,969 persons within the appellant school district, and 31,464 persons within the appellant city, voted at the *combined election*. It also appears in both certificates that the total number of votes at the last gubernatorial election within the city of Tacoma was 51,057, forty per cent of which number would be 20,423.

It is appellants' contention that the number of persons who voted at the special election in each taxing district is to be determined by the number who voted

in the combined election in that district, regardless of the number who actually voted upon the special tax proposition. The respondent, on the other hand, contends that the number of persons who voted at the special election in each taxing district is to be determined solely by the total number of persons who cast their ballots on the particular special tax proposition. If appellants' contention be correct, then both propositions carried by a majority of over 11,000 votes, but if respondent's contention be accepted as correct, then both propositions failed to carry, in the one instance by 1,461 votes and in the other by 2,404 votes.

It is apparent that, if on March 2, 1942, there had been no combined election, but merely a special election upon the two tax propositions as submitted, it would have been necessary, in any event, for at least 20,423 persons to have voted at such special election in order to create a valid authority for levying the proposed taxes, and this would have been true even though three-fifths of those actually voting thereat had expressed themselves in favor of the respective proposals. It is also apparent that if at such separate special election neither proposition had received a greater number of votes than that which it actually received at the combined election, both propositions would have failed of adoption because of the forty per cent requirement.

We fail to see any reason why a different result should obtain under the present circumstances merely because at the combined elections, general and special, 20,423, or more, persons participated in the *general election* of officers. That election had no bearing upon the special election and was as distinct therefrom in purpose as though held at a different time and place. To follow appellants' contention would lead to incongruous and surprising results. A single illustration will suffice. A tax proposition, such as those involved here,

could be voted upon at a special election when combined with a regular presidential election, at which the vote is usually heavy. If only five persons should then cast their ballots upon such special tax proposition and three of them should vote in the affirmative thereon, the proposition would carry, on appellants' theory that the number of persons voting *at the presidential election* was to be considered as determining the number who voted at the special election. In adopting the initiative and referendum measures above referred to, the people certainly did not intend that result. To the contrary, they declared in each of those legislative measures that the total number of persons *voting at such special election* should constitute forty per cent of the voters in such taxing district who voted for the office of governor at the next preceding gubernatorial election.

As already stated, the combined election constituted a special election in so far as the tax propositions were concerned, thus coming squarely within the application of the initiative and referendum acts. It will be further observed that these same acts specifically require that such propositions should be submitted in such form as to enable the voters favoring them to vote "YES" and those opposing them to vote "No." That requirement was immediately followed by the proviso setting forth the forty per cent requirement.

It is to be remembered that the fundamental purpose of both the initiative and the referendum measures, to which we have frequently adverted, was to limit the aggregate annual tax levy on real and personal property to forty mills. Under carefully drawn provisos in both acts, certain taxing districts, including cities and school districts, were permitted to levy additional taxes, but the power thus to be exercised was hedged

about with mandatory requirements regarding special elections, the form of the ballots to be used, and the number of persons who must participate in such special elections in order to confer the taxing power.

The purpose of the legislature and of the people themselves in enacting this form of legislation undoubtedly was to effect a guaranty that additional taxes, over and above the forty mill limit, should not be sanctioned unless a certain number of qualified voters should express themselves on the proposition, at a special election called and held for that purpose, and, conversely, to prevent the adoption of such measures, often entailing the issuance of municipal bonds, by a handful of people or by especially interested and active groups. Should as many as forty per cent of the specified number of voters participate in such special election, affirmative action upon a submitted proposition will, in any event, require but three-fifths, or sixty per cent, of that number, which would be but twenty-four per cent of the whole. That is not an unreasonable requirement; at least, the people did not think so.

We have not been referred to any decision bearing directly upon the question here involved, nor to any statute similar to ours. However, the case of *Fox v. Seattle, supra,* which was decided prior to the adoption of the initiative and referendum measures, uses language which we believe to be pertinent here. It is there said:

"In this case we hold that the language 'without the assent of three-fifths of the voters therein voting at an election to be held for that purpose' means at an election held for the purpose of voting upon *this proposition,* and not for the purpose of voting on manifold propositions that may be submitted at a *general election; and that the fact that the election was held at the same time and with an election for other purposes does not affect in any manner the count on the number of*

*votes cast for the purpose of determining the proposition submitted, viz., the proposition of indebtedness."* (Italics ours.)

The case of *Gottstein v. Lister*, 88 Wash. 462, 153 Pac. 595, is also of some interest upon the point now under consideration. It appears from the opinion in that case that a suit was brought to enjoin the enforcement of initiative measure number 3, approved by the people at a general election held November 3, 1914. At that election, the people voted upon nine initiative and referendum measures and also upon a number of candidates for various offices. As found by this court, a total of 381,643 electors voted at the general election, 361,048 voted upon initiative measure number 3, and, of these, 189,840 votes were cast in favor of its adoption, and 171,208 votes against it. One of the issues in the case rested upon that provision of the seventh amendment to the Washington constitution reading as follows:

"Any measure initiated by the people or referred to the people as herein provided shall take effect and become the law if it is approved by a majority of the votes cast thereon: *Provided, that the vote cast upon such question or measure shall equal one-third of the total votes cast at such election and not otherwise."* (Italics ours.)

This court held that, since more than one-third of the voters who voted at the election of 1914 voted upon the question of the adoption of initiative measure number 3, and since the majority of them voted in its favor, the measure was constitutionally adopted within the meaning of the seventh amendment, so far as the required number of votes was concerned. While that case does not meet the exact situation presented here, it nevertheless demonstrates the attitude of this court with reference to the effect of a mandate of the people

requiring that a specified number of votes be cast at a special election in order to give validity to a measure voted upon therein.

One phase of appellants' argument is to the effect that the certificates of election recite that *31,969* people voted at the school district election and *31,464* voted at the city election, either of which figures is more than forty per cent of 51,057, the number of votes cast at the preceding gubernatorial election. Appellants contend that this finding by the election board is binding and cannot be set aside by the courts. The argument is predicated upon an incorrect premise. It is clear from a reading of the certificates that 31,969 people voted at the school district *general* election, but only 18,962 voted either "YES" or "NO" on the tax proposition submitted at its *special* election, and further, that 31,464 people voted at the city *general* election, but only 18,019 voted "YES" or "NO" on the tax proposition submitted at its *special* election. In neither instance did the votes cast upon the special proposition equal the required forty per cent of those who voted for the office of governor at the next preceding gubernatorial election.

We are convinced that the instant case was correctly decided by the trial court. The judgment is therefore affirmed.

ROBINSON, C. J., MILLARD, SIMPSON, and JEFFERS, JJ., concur.